# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| **MAYNE & MERTZ INC.** | **CIVIL ACTION NO. 06-0800** |
| **VS.** | **JUDGE MELANÇON** |
| **QUEST EXPLORATION LLC**<br>**EXCALIBUR LAND CO.** | **MAGISTRATE JUDGE METHVIN** |

## REPORT AND RECOMMENDATION
## ON MOTION FOR SUMMARY JUDGMENT
*(Rec. Doc. 8 )*

Before the court is a motion for summary judgment filed by defendant Excalibur Land

Company, Incorporated ("Excalibur").  For the following reasons, it is recommended that

Excalibur's motion be **DENIED**.[1]

### Background

This is a diversity trade secret case involving disclosure of 3-D seismic data related to oil

and gas exploration.  The general factual background is not in dispute.

Plaintiff Mayne & Mertz ("M&M") is in the business of exploring for oil and gas.  On

August 5, 2002, M&M contracted to conduct seismic operations on Excalibur's lands in

Calcasieu Parish in an effort to locate optimum well sites ("the Permit").[2]  M&M also obtained

the right to acquire mineral leases on such lands for eighteen months, with the right to extend the

---

[1]  On June 1, 2006, Excalibur filed a motion to dismiss and alternatively for summary judgment (Rec. Doc. 8).
M&M filed an opposition to the motion, and both parties filed supplemental memoranda (Rec. Docs. 15, 21, 35).
On October 26, 2006, the district judge referred the motion to the undersigned for report and recommendation (Rec.
Doc. 43).  Because the parties submitted documents which are not part of the complaint filed in this matter, the
undersigned converted the motion to a motion for summary judgment and allowed the parties additional time to brief
the matter (Rec. Doc. 41).  On November 2, 2006, both Excalibur and defendant Quest Exploration, L.L.C.
("Quest")  filed memoranda in support of summary judgment (Rec. Docs. 44, 45).  M&M filed responses to both
briefs on November 9, 2006.  The matter has been given expedited consideration.

[2] Exhibit B to Rec. Doc. 8.

lease option for an additional six months ("the Option Agreement").[3] The Permit obligated M&M to provide the seismic survey data to Excalibur, subject to certain confidentiality provisions.[4]

Using its seismic data, M&M drilled a successful well prior to the time both agreements expired on August 5, 2004. On September 23, 2004, contemplating additional drilling, the parties signed a letter agreement which gave M&M the right "to acquire an oil, gas, and mineral lease on lands owned by Excalibur." On February 3, 2005, M&M sent a letter to Excalibur requesting a mineral lease on 409 acres.[5] The land was specifically described and a map was attached. Excalibur did not grant M&M's request.[6] Instead, in May/June, 2005, Excalibur and Quest began discussing Quest's interest "in exploring the possibility, as consultant, to evaluate the Seismic data on portion of your acreage in 10S-7W, Calcasieu Parish, La."[7] On June 16, 2005, Quest and Excalibur entered into a Non-Disclosure and Confidentiality Agreement whereby the seismic data was transmitted to Quest as a consultant.[8] In turn, Quest hired Steve Anderson to "perform consulting and technical services for interpretation of the confidential information herein delivered."[9] On August 19, 2005, Quest sent a letter to Excalibur's parent

---

[3] Exhibit A to Rec. Doc. 8.

[4] The Permit limited access to the data to Excalibur's employees; prohibited Excalibur from selling, assigning, copying, transferring, displaying, exhibiting, or in any way revealing the data to others, except for its employees, bona fide consultants, and others expressly approved of by M&M. *See* Exhibit B to Rec. Doc. 8, Sections 11, 16.

[5] Exhibit D to Rec. Doc. 8.

[6] Rec. Doc. 35 at Paragraph 16.

[7] Exhibits 6, 7 to Rec. Doc. 15.

[8] Exhibit 11 to Rec. Doc. 15.

[9] Exhibit 12 to Rec. Doc. 15.

company explaining that "Quest has been interpreting and reformatting the seismic data" and that based on their analysis, Quest requested a lease to drill in the precise area that M&M had identified in its lease request.[10]  Excalibur leased the land to Quest for drilling.

On May 15, 2006, M&M filed a Complaint alleging that Excalibur misappropriated M&M's trade secrets by divulging the seismic data to Quest and that Quest misappropriated the trade secrets by using and continuing to use the seismic data in the course of drilling on Excalibur's lands.  M&M also asserts claims of unfair trade practices against Excalibur and Quest, breach of contract claim against Excalibur, and an unjust enrichment claim against Quest.

### *Motion for Summary Judgment*

Excalibur and Quest seek summary judgment on grounds that the seismic data is not subject to trade secret protection because neither the Permit nor the Option Agreement identified the data as a "trade secret."  Movers further contend that any rights or obligations of the parties – including confidentiality rights – expired on August 5, 2004, pursuant to the express terms of the Permit and the Option Agreement.  Excalibur alleges that it was not "under any obligation to protect the 3-D seismic data furnished to it pursuant to the expired Permit" after August 5, 2004.[11]

Excalibur admits that it granted a mineral lease to Quest for lands in which M&M had expressed an interest in exploring, but points out that M&M's interest was communicated after August 5, 2004, when M&M's lease option rights expired.  Excalibur further contends that the

---

[10] Exhibit 15 Rec. Doc. 15.

[11] Memorandum in support of motion to dismiss,  Rec. Doc. 8-3, page 7.

letter agreement dated September 23, 2004, created no new lease option because it contained no specific time period as required by La. Civ. Code art. 1933.

*Legal Analysis*

**I.    <u>Summary Judgment Standard</u>**

A motion for summary judgment shall be granted if the pleadings, depositions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED.R.CIV.P. 56; <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069 (5th Cir.1994)(*en banc*).  An issue is material if its resolution could affect the outcome of the action.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  In deciding whether a fact issue has been created, the court must view the facts and the inferences in the light most favorable to the nonmoving party.  <u>Olabisiomotosho v. City of Houston</u>, 185 F.3d 521, 525 (5th Cir.1999).

The standard for summary judgment mirrors that for judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence.  <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 135, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).  The court must disregard all evidence favorable to the moving party that the fact finder is not required to believe, and should give credence to evidence which is uncontradicted and unimpeached, regardless of which party it favors.  <u>Id</u>. at 151, 120 S.Ct. 2097.

Where, as here, the non-moving party has the burden of proof at trial, the moving party may obtain summary judgment by demonstrating the absence of evidence supporting the non-moving party's claim.  <u>Celotex Corp.</u>, 477 U.S. at 324.  Once the movant produces such

evidence, the burden shifts to the respondent to cite evidence in the record sufficient to establish that there is a genuine issue of material fact requiring a trial.  Id.  The responding party may not rest on mere allegations made in the pleadings as a means of establishing a genuine issue worthy of trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Little, 37 F.3d at 1075.  If no issue of fact is presented and if the mover is entitled to judgment as a matter of law, the court is required to render the judgment prayed for. FED.R.CIV.P. 56(C); Celotex Corp., 477 U.S. at 322.  Before it can find that there are no genuine issues of material fact, however, the court must be satisfied that no reasonable trier of fact could have found for the non-moving party.  Id.

## II.     Section 16 of the Permit

The Permit which gave M&M the right to conduct seismic operations contains 26 sections outlining the rights and obligations of the parties.  Section 16 addresses the use of the seismic data, which is the subject of the instant lawsuit and motion.  Under this section Excalibur was granted "the right to receive unprocessed field tape copies and associated documentation over the Lands to the extent that 3-D seismic data was acquired by Grantee on the Lands." M&M was required to "use its best efforts to treat as confidential and secret the data and all copies, analyses, reprocessings, and reformatting thereof in all forms and media."

In addition, Section 16 explicitly limit's Excalibur's use of the data.  Among other things, Section 16 contained the following restrictions:

1.    "[Excalibur] shall not sell or trade the data;"

2.    "[Excalibur] may not sell, assign, copy, transfer, display, exhibit or in any way reveal the data, except as authorized by and in compliance with the provisions of this Agreement;"

3.    "Access to the data shall be limited to [Excalibur's] employees. [Excalibur] many make copies of the data and its adaptations for is own internal use only."

4.    "[Excalibur] agrees that all data, and copies thereof, shall not be made available to other parties," except a *bona fide* consultant under certain conditions, including the requirement that the consultant agree, in writing, "to maintain the data in the strictest confidence and not to disclose the data or the adaptations, reprocessings, or reformattings derived therefrom to any to any other person and not use it for any purpose other than its work for [Excalibur]"; and "that the data shall not be removed from the Consultant(s) premises or be shown or transmitted to any person in any form or via electronic transmission from any location."

5.    "[Excalibur] shall not sell, convey, deliver, trade, exchange, transfer, or otherwise share the data, manually or electronically, with any entity or individual without the express prior written approval of [M&M]."[12]

---

[12] *See* Exhibit B to Rec. Doc. 8 at pps. 12-13. The exact wording of the pertinent provisions of Section 16 is as follows:

**Section 16.** Grantee shall have the right to conduct 3-D seismic operations across the permitted property during the term of this permit. As to any seismic surveys conducted by Grantee, the parties agree as follows:

\*\*\* In addition, Grantor retains the right to receive unprocessed field tape copies and associated documentation over the Lands to the extent that 3-D seismic data was acquired by Grantee on the Lands. Grantor's rights to use the data shall be restricted except as provided hereinbelow. Furthermore, Grantor shall not sell or trade the data.

Grantee shall use its best efforts to treat as confidential and secret the data and all copies, analyses, reprocessings, and reformatting thereof in all forms and media.

Grantor agrees and acknowledges that: a) Grantor's rights in and to the data are expressly limited by the terms of this Agreement; and b) Grantor may not sell, assign, copy, transfer, display, exhibit or in any way reveal the data, except as authorized by and in compliance with the provisions of this Agreement.

Access to the data shall be limited to Grantor's employees. Grantor many make copies of the data and its adaptations for is own internal use only. Grantor agrees that all data, and copies thereof, shall not be made available to other parties, except under the following conditions:

(a) Said data may be available to Consultant(s) retained by Grantor for the purpose of performing an interpretation, reprocessing, or reformatting for Grantor provided that Consultant(s) executes and delivers to Grantor a written agreement, to be provided to Grantee upon request, whereby Consultant(s) agrees (i) to maintain the data in the strictest confidence and not to disclose the data or the adaptations, reprocessings, or reformattings derived therefrom to any to any other person and not use it for any purpose other than its work for Grantor, and (ii) that the data shall not be removed from the Consultant(s) premises or be shown or transmitted to any person in any form or via electronic transmission from any location. Each Consultant(s) must be clearly recognized as a bona fide consultant, or as a bona fide geophysical processor, within the oil and gas industry.

**III.    Is the seismic data a trade secret?**

Movers contend that the seismic data was not a trade secret, and that they were free to use the seismic data at will.

There is no dispute that Louisiana law governs the central issue presented: whether the data in question is entitled to trade secret protection.  In order to recover damages under Louisiana's Uniform Trade Secrets Act, the plaintiff must prove: 1) the existence of a trade secret; 2) misappropriation of the trade secret by another; and 3) actual loss caused by the misappropriation.  La. R.S. 51:1431 *et seq. See also* Computer Management Assistance Company v. Robert F. DeCastro, 220 F.3d 396, (5th Cir. 2000).

Under Louisiana law, a trade secret is defined as follows:

> 4.    "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (a)    derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
>
> (b)    is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Louisiana R.S. 51:1431(4).

The requirement in subsection (b) that "reasonable efforts" be made to maintain the secrecy of the information refers to "relative secrecy" rather than "absolute secrecy." Sheets v.

---

(b) Grantor shall not sell, convey, deliver, trade, exchange, transfer, or otherwise share the data, manually or electronically, with any entity or individual without the express prior written approval of Grantee. * * *

<u>Yamaha Motors Corp., U.S.A.</u>, 849 F.2d 179, 183 (5th Cir.1988). Comment (f) following La.

R.S. 51:1431 states:

> (f) Reasonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on a "need to know basis", and controlling plant access. On the other hand, public disclosure of information through display, trade journal publications, advertising, or other carelessness can preclude protection.
>
> The efforts required to maintain secrecy are those "reasonable under the circumstances." The courts do not require that extreme and unduly expensive procedures be taken to protect trade secrets against flagrant industrial espionage. *See* <u>E. I. du Pont de Nemours & Co., Inc. v. Christopher</u>, *supra.* It follows that reasonable use of a trade secret including controlled disclosure to employees and licensees is consistent with the requirement of relative secrecy.

Movers contend that the seismic data in this case is not a trade secret because (a) the Permit did not identify the seismic data as a "trade secret;" and therefore once the contract expired, Excalibur was free to use the information at will; (b) the seismic data did not have any independent economic value to M&M, because the data could not be utilized in the absence of an accurate interpretation by an expert, or in the absence of the necessary leases, which M&M was unable to obtain; and (c) if Excalibur was not free to use the seismic data to its advantage, the data had no economic value to Excalibur; (d) the Permit was not kept secret because it guaranteed that Excalibur and its consultants would have access to the data.

M&M contends that its seismic data meets all of the requirements of Louisiana law. M&M relies upon the affidavit of Michael Puzio, a geologist, which states in pertinent part:

5. The seismic exploration program cost M&M in excess of 9.8 million dollars to complete.

6. M&M considered the seismic data to be valuable because it allowed M&M to negotiate with Excalibur (and other landowners whose lands were covered by the seismic) in ways in which its competitors could not.

7.  Because it had paid to obtain the seismic data, for example M&M could develop prospects on the land covered by its seismic shoot that other oil and gas companies could not develop.

\*\*\*

12. Seismic data is frequently sold in oil and gas circles by those who hold it to those who wish to develop exploration and drilling programs on lands covered by the seismic.

13. Seismic data loses its commercial value if it is not kept secret and confidential. If other oil and gas companies review the seismic data of M&M, then M&M loses its competitive advantage, and it loses the ability to market the seismic data to others.

14. Seismic data has independent value because it is difficult, time-consuming, and expensive to acquire, process, and interpret, and because it shows where oil and gas deposits are likely to be. If it is disclosed, it loses the value because others can determine where those oil and gas deposits are likely to be.

15. Seismic data is not readily ascertainable. You can only use seismic data either (i) by acquiring it, processing it, and having it analyzed by a geophysicist, or (ii) by obtaining it from someone who has already done that. Seismic data cannot be reverse engineered.[13]

M&M maintains that the seismic data was expensive and time-consuming to gather and that the data was valuable because others did not know where the potential oil and gas deposits were located absent use of this data. M&M argues that the data was valuable to both M&M and Excalibur during the existence of the Permit and afterwards. While the Permit existed, both parties could use the data to negotiate lease options and after the Permit expired, M&M could sell the data and Excalibur could, assuming the confidentiality obligations survived the expiration of the Permit, use the data to seek out exploration partners (assuming it obtained the written approval of M&M). Additionally, M&M argues that it attempted to keep the seismic data

---

[13] Exhibit 3 to Rec. Doc. 35.

from being divulged to third-parties, except in limited circumstances, and therefore, reasonable efforts were made to maintain its secrecy.

### (a) Identification as "trade secret"

Movers have offered no legal support for their argument that M&M's failure to include in the Permit an affirmative statement that the seismic data was a trade secret precludes the court from determining that the data is entitled to protection under La. R.S. 51:1431 *et seq.*  There is no such requirement in the statute, nor have movers provided other authority for their position.  Accordingly, this argument is without merit.

### (b) Economic value of the data to M&M

It is clear that the seismic data was valuable.  The acquisition of the data was costly and time-consuming, but was justified by the obvious potential payoff: the specific location of valuable oil & gas deposits.  M&M could have used the data to negotiate lease options with Excalibur, and in the event that it was unable to secure a lease, M&M could sell the data to other parties interested in obtaining leases from Excalibur.  Since the value to M&M was predicated on M&M having information that other parties did not have, i.e., the location of possible oil and gas deposits, it appears that the seismic data derived independent economic value from not being known and readily ascertainably by other parties.

### (c) Economic value of the data to Excalibur

The seismic data was also valuable to Excalibur.  During the term of the Permit, Excalibur could use the data to negotiate lease options with M&M.  After the Permit expired, Excalibur could use the data to seek out exploration partners, assuming it obtained the written

approval of M&M. Excalibur could use the data to its advantage, and therefore, it had economic value to Excalibur.

### (d) Secrecy of the data

M&M took steps to maintain the secrecy of the seismic data by including confidentiality provisions in the Permit. While the data could be divulged to third-parties, there were strict limitations on such use. As noted above, Excalibur agreed in Section 16 of the Permit that "all data, and copies thereof, shall not be made available to other parties." An exception was made for "a *bona fide* consultant" under certain conditions, including the requirement that the consultant agree, in writing, "to maintain the data in the strictest confidence and not to disclose the data or the adaptations, reprocessings, or reformattings derived therefrom to any to any other person and not use it for any purpose other than its work for [Excalibur]." The agreement also provided "that the data shall not be removed from the Consultant(s) premises or be shown or transmitted to any person in any form or via electronic transmission from any location."

The trade secret statute, La. R.S. 51:1431(4)(b), requires that efforts to maintain secrecy be "reasonable under the circumstances." Since the Permit did allow limited availability to third-parties and it guaranteed that Excalibur have access to the data, it must be determined whether M&M made "reasonable attempts" to keep the data secret. The reasonableness of M&M's attempts is a question of fact which should be reserved for the trier of fact.

For the purposes of this motion, the only question is whether the court should grant summary judgment holding that the seismic data in question was not a trade secret. The foregoing analysis indicates that, in fact, the data appears to meet the statutory definition of trade secret information. However, there are material facts in dispute with respect to whether M&M's

efforts to maintain the secrecy of the data were "reasonable efforts" within the meaning of the statute. Accordingly, the undersigned concludes that summary judgment is not appropriate on the question of whether the seismic data meets the legal test for trade secrets.

**IV.** __Did the confidentiality agreement expire?__

Excalibur contends that even if the seismic data is a trade secret, "the contract providing for confidentiality expired two years from the date it was executed."[14]  Excalibur argues, therefore, that they did not breach the contract by providing the seismic data to Quest because the obligation to keep the data confidential had expired.  M&M argues that the confidentiality agreement did not terminate upon expiration of the Permit.

In this diversity action involving the interpretation of a contract, the court must apply the substantive law of Louisiana.  Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *See also* Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).  The interpretation of a contract "is the determination of the common intent of the parties."  La.Civ.Code Art. 2045.  "When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La.Civ.Code Art. 2046.

"A contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight." Texas Eastern Transmission Corp. v. Amerada Hess Corp., 145 F.3d 737, 742 (5th Cir.1998) *citing* Lloyds of London v. Transcontinental Gas Pipe Line Corp., 101 F.3d 425, 429 (5th Cir.1996).  On the other hand, a contract is ambiguous, under Louisiana law, "when it is uncertain as to the parties'

---

[14] Rec. Doc. 21 at p. 4.

intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction." See Lloyds of London, 101 F.3d at 429. The determination that a contract is ambiguous is a question of law. Concise Oil and Gas Partnership v. Louisiana Intrastate Gas Corporation, 986 F.2d 1463, 1469 (5th Cir.1993).

"A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La.Civ.Code Art.2053. "In the context of contract interpretation under Louisiana law, only when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment." In re Jazzland, Inc., 161 Fed.Appx. 436, 2006 WL 151907, 1 (5th Cir. 2006) citing Amoco Prod. Co. v. Texas Meridian Res. Exploration Inc., 180 F.3d 664, 669 (5th Cir.1999).

The Option Agreement between Excalibur and M&M, which gave M&M exclusive mineral leasing rights for a period of time, was for a term of 18 months, with an option to extend it for an additional six months.[15] The Permit, which gave M&M the right to conduct seismic operations provided:

> So far as, and only in so far as the rights of Grantor are concerned, you are hereby granted a permit for a period of Eighteen (18) months from the date hereof with the option to extend permit for an additional six (6) months, to conduct seismograph operations across the above described lands subject to the following terms and conditions, to-wit...[16]

---

[15] Exhibit A to Rec. Doc. 8.

[16] Exhibit B to Rec. Doc. 8 at p. 7.

Excalibur argues that the confidentiality agreement in Section 16 terminated at the same time as the right to conduct seismic operations, i.e., two years after the Permit was signed.  In support, Excalibur maintains that prior to executing the Permit, the parties had discussed putting a time limit on the confidentiality agreement, with Excalibur wanting to limit the time to 2-4 years.  The Permit, however, does not have such a limit, and therefore, Excalibur argues that the absence of the time limit shows that the confidentiality agreement ended when the Permit expired.  Excalibur also argues that since one provision in the Permit specifically stated that the obligation of M&M to provide seismic data to Excalibur survive termination of the contract, the fact that the confidentiality agreement did not have such specific language, shows that the confidentiality obligations expired with the contract's expiration.

A review of the contract shows that it is unclear when the confidentiality agreement expired.  Although the right to conduct seismic operations expired two years after the Permit was executed, that provision does not extend, either expressly in the contract or logically, to the agreement to keep the data confidential.  Although the seismic operations taking place on the lands may have had to cease, the analysis and compilation of the data did not cease at that time because, as set forth in the affidavit of geologist Michael Puzio:

17.     The "shooting" or acquisition of the seismic data is only one step in seismic exploartion.

18.     It is many months, and sometimes more than a year, after the seismic crews leave the land before the seismic data is in any way useful for oil and gas exploration.

19.     After acquisition, the seismic data must be "processed," that is, run through powerful computers that arrange the data and put it into a usable form.

20.     This process takes months, and sometimes more than a year.

21.    The processing of the data does not involve any seismograph operations on the land itself.

22.    Indeed, the majority of the processing does not begin until after the seismic crews have left the land for good.

23.    Seismic data is never usable, or even useful, until after it has been processed.

26.    In the case of the seismic shoot at issue in this litigation, the overall time period from the day the last seismic shot was fired on the land to the date of the final processing was accepted was more than eight months.[17]

According to the foregoing, as long as M&M was conducting seismic operations, it was acquiring the data that would then have to be processed and put into a usable form.  If, as according to Excalibur, the rights and obligations of Section 16 terminated with the expiration of the Permit, which was the last day which M&M was allowed to conduct seismic operations, then the rights and obligations of Section 16 could possibly cease before the data covered by the section was capable of being used.

Moreover, the fact that one section of the Permit expressly extends beyond the termination of the Permit does not show that the other sections terminate with the expiration of the Permit.  Section 11 of the Permit, dealing with certain obligations of M&M, expressly states that "The expiration/termination of this permit shall not release Grantee from its obligations pursuant to Section 11 of the permit."  This, however, does not affect the determination of when the other sections terminate.  As pointed out by M&M, other sections do not expressly provide that the obligation extends beyond the operational term of the Permit, yet to construe the terms of the contract otherwise would be illogical.  For instance, Section 10 sets forth M&M's obligation to indemnify Excalibur for property and personal injuries in connection with or resulting from the

---

[17] Exhibit 3 to Rec. Doc. 35.

operations. Section 10 does not state that M&M's indemnity obligation survives the termination of the Permit. Clearly, however, M&M's obligation to indemnify Excalibur did not expire on the date that the Permit expired because then M&M would not be required to indemnify Excalibur for claims arising from the operations but not brought until after the expiration of the term. Likewise, Section 9 obligates M&M to pay for and repair damages to crops, fences, wells, etc. caused by its operations. This provision does not state that M&M's obligation extends beyond the termination of the Permit, yet it is inconceivable that the parties intended for M&M's obligation to cease with the Permit operations term.

Further, Excalibur's argument regarding the negotiation of the time limitation does not show that the confidentiality agreement expired when the Permit terminated. During the negotiation of the Permit, Excalibur requested that it be allowed to use the seismic data subject to a confidentiality agreement that would survive the termination of the Permit for a four-year period and subsequently it requested that the survival be limited to a two-year period. In response, M&M advised that it would consult legal counsel because, "We have had recent experience with landowners giving out our data and allowing third parties to use our data in competition with us."[18] M&M's negotiator, Dennis Sharp, testified that he did not recall the specific discussion regarding the time limit of the confidentiality agreement, however it was his thought that the confidentiality obligation was "unending" because the final draft of the Permit did not include any specific time limit for the expiration of the confidentiality obligation.[19]

---

[18] Exhibit 1 to Rec. Doc. 46.

[19] Exhibit 2 to Rec. Doc. 45 at p. 85.

Clearly, there is more than one reasonable interpretation of the Permit concerning the expiration of the confidentiality obligation. A reasonable fact finder could find either that the Permit and the confidentiality agreement expired at the same time or that the confidentiality obligation survived the termination of the Permit. In order to determine the true intent of the parties, the fact finder will have to assess the testimony and credibility of various witnesses regarding what the parties thought their obligations were before, during, and after the life of the Permit. Thus, there is a material fact issue concerning the parties' intent, and summary judgment is precluded. In re Jazzland, Inc., 161 Fed.Appx. 436, 2006 WL 151907, 1 (5th Cir. 2006) *citing* Amoco Prod. Co. v. Texas Meridian Res. Exploration Inc., 180 F.3d 664, 669 (5th Cir.1999).

**V.   Was Quest a *bona fide* consultant?**

Movers contend that even if the confidentiality obligations did not cease when the Permit expired, under the terms of the agreement, Excalibur was free to share the seismic data with "bona fide consultants" such as Quest. M&M contends that the Quest consultancy was a sham.

Section 16 of the Permit allowed Excalibur to divulge the seismic data to a *bona fide* consultant provided that the consultant executes a confidentiality agreement.[20] M&M argues that the first e-mails between Quest and Excalibur discuss Quest's interest in entering a mineral lease and that Quest did not offer "true" consulting services because it had to hire a consultant to interpret the seismic data in order for it to prepare a report for Excalibur. Additionally, M&M maintains that further proof that Quest was not truly providing consultant services, but rather was engaged in a business dealing aimed at obtaining a mineral lease, is the fact that Quest's fee for its consulting services was tied to its ability to obtain a mineral lease. Excalibur does not address

---

[20] Exhibit B to Rec. Doc. 8 at p. 13.

these arguments, but rather dismisses them as "irrelevant" because at the time that Excalibur engaged Quest's services, the confidentiality obligations had expired and therefore Excalibur was free to share the seismic data with other parties.

In the event that the trier of fact determines that the confidentiality obligations remained in existence when Excalibur shared the seismic data with Quest, the issue of whether or not Quest was a *bona fide* consultant will require assessment. There are issues of material fact concerning whether Quest was a qualified consultant and whether the consultancy was for Excalibur's gain or purely for Quest's. These issues will require credibility determinations. Thus, summary judgment is precluded on this issue.

### *Conclusion*

For the foregoing reasons, the undersigned concludes material issues of fact exist regarding whether the seismic data is a trade secret, the terms of the confidentiality obligations, and whether Quest was a *bona fide* consultant. As such, it is recommended that Excalibur's Motion for Summary Judgment be denied.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P.**

6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  See **Douglass v. United Services Automobile Association**, 79 F.3d 1415 (5th Cir.  1996).

Signed at Lafayette, Louisiana, on December 5, 2006.

_____
Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)