UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| Mayne & Mertz, Inc. | Civil Action No. 6:06-0800 |
| versus | Judge Tucker L. Melançon |
| Quest Exploration, LLC, et al | Magistrate Judge Methvin |

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment, filed by Quest Exploration, LLC. ("Quest") [Rec. Doc. 75]; a Motion for Partial Summary Judgment filed by Excalibur Land Company, Inc. and Texas Tea, L.L.C. ("Excalibur") [Rec. Doc. 76]; plaintiff, Mayne & Mertz, Inc.'s ("M&M") response to both motions [Rec. Doc. 86]; replies to M&M's response filed by Quest and Excalibur [Rec. Docs. 91, 98]; and, a sur-reply filed by M&M [Rec. Doc. 101]. For the reasons that follow, the motions filed by Quest and Excalibur will be denied.

*I. Background*

This is a trade secret case involving disclosure of 3-D seismic data related to oil and gas exploration. The general factual background is not in dispute and has been set out in the previously filed Report and Recommendation related to Excalibur's motion to dismiss and alternative motion for summary judgment. *R. 48.* Accordingly, the Court will only recite the undisputed facts pertinent to the instant

motion.

Plaintiff, M&M, is in the business of exploring for oil and gas. On August 5, 2002, M&M contracted to conduct seismic operations on Excalibur's lands in Calcasieu Parish in an effort to locate optimum well sites. M&M also obtained the right to acquire mineral leases on such lands for eighteen months, with the right to extend the lease option for an additional six months. The contract obligated M&M to provide the seismic survey data to Excalibur, subject to certain confidentiality provisions.

Using its seismic data, M&M drilled a successful well ("Excalibur 22 No. 1 well") on August 3, 2004, prior to the time the contract expired. On September 23, 2004, contemplating additional drilling, the parties signed a letter agreement which gave M&M the right "to acquire an oil, gas, and mineral lease on lands owned by Excalibur." On February 3, 2005, M&M sent a letter to Excalibur requesting a mineral lease on 409 acres. The land was specifically described and a map attached, and referred to by the parties as the Straight Line Prospect.[1]

Excalibur did not grant M&M's request. Instead, in May or June 2005, Excalibur and Quest began discussing Quest's interest "in exploring the possibility,

---

[1] The area that M&M sought to lease from Excalibur, but that was eventually leased by Excalibur to Quest is described by Michael C. Puzio, M&M's Exploration Manager as "the South Manchester Field ... to the east of the Mayne & Mertz Excalibur 22 No. 1 well." *Exh.C.*

as consultant, to evaluate the Seismic data on a portion of your acreage in 10S-7W, Calcasieu Parish, La." On June 16, 2005, Quest and Excalibur entered into a Non-Disclosure and Confidentiality Agreement whereby the seismic data was transmitted to Quest as a consultant. In turn, Quest hired Steve Anderson to "perform consulting and technical services for interpretation of the confidential information herein delivered". On August 19, 2005, Quest sent a letter to Excalibur's parent company explaining that "Quest has been interpreting and reformatting the seismic data." Based on their analysis, Quest requested a lease to drill in the same area which M&M had identified in its lease request, the Straight Line Prospect. Excalibur leased the land to Quest for drilling.

On May 15, 2006, M&M filed a Complaint alleging that Excalibur misappropriated M&M's trade secrets by divulging the seismic data to Quest and that Quest misappropriated the trade secrets by using and continuing to use the seismic data in the course of drilling on Excalibur's lands. M&M also asserted claims of unfair trade practices against Excalibur and Quest, breach of contract claim against Excalibur, and an unjust enrichment claim against Quest. On June 1, 2006, Excalibur filed a motion to dismiss for failure to state a claim and alternative motion for summary judgment. *R.8*. In a report and recommendation to the Court, adopted by the Court on December 20, 2006 [Rec. Doc. 51], the magistrate judge recommended

that the motion be denied based on "material issues of fact [that] exist regarding whether the seismic data is a trade secret, the terms of the confidentiality obligations, and whether Quest was a *bona fide* consultant." On August 6, 2007, Excalibur and Quest filed the instant motions.

*II. Summary Judgment Standard*

A motion for summary judgment shall be granted if the pleadings, depositions, and affidavits submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56*; *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When a party seeking summary judgment bears the burden of proof at trial, it must come forward with evidence which would entitle it to a judgment as a matter of law if the evidence were uncontroverted at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim. *Id.* at 324.

Once the movant produces such evidence, the burden shifts to the respondent to direct the attention of the court to evidence in the record sufficient to establish that there is a genuine issue of material fact requiring a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once a proper motion for summary judgment has been

made, the non-movant must bring forward sufficient evidence to show that a genuine issue of material fact exists for every element of a claim. *Celestine v. Petroleos de Venezuela SA*, 266 F.3d 343 (5th Cir. 2001). If no issue of fact is presented and if the mover is entitled to judgment as a matter of law, the court is required to render the judgment prayed for. *Celotex* at 322-23. Before it can find that there are no genuine issues of material fact, however, the court must be satisfied that no reasonable trier of fact could have found for the non-moving party. *Id.*

### III. Analysis

In its motion for partial summary judgment, Excalibur moves the Court to dismiss plaintiff's claims as to damages. Excalibur asserts that "if M&M is able to prove a breach of contract between itself and Excalibur, M&M has the burden of proving with full legal certainty, that Excalibur's breach has caused it to sustain damage.... [which] it cannot do." *R. 76*. Quest, in its motion for summary judgment, requests that the Court dismiss all claims against it as M&M "sustained no actual damages it may blame on Quest" and "in light of Quest's return of the seismic data and its consent to a permanent injunction." *R. 75*. In essence, both motions contend that M&M cannot meet its burden to establish damages under existing Louisiana state and Fifth Circuit law as the evidence upon which M&M relies is too speculative and based on conjecture. The Court will therefore consider both motions together.

M&M argues in its opposition to both motions that it "has engaged respected, qualified experts who have used recognized techniques to value the damages at an 80 percent level of certainty, and that is more than enough [to establish a claim for damages] under federal standards or Louisiana law." *R. 86.* In response to Quest's motion, M&M contends that Quest cannot absolve itself of the damages it has done to M&M by giving back the alleged proprietary data and agreeing to a permanent injunction after the data was misused by Quest. *Id.*

The record indicates that M&M's experts, W. H. Robbins, Wayman T. Gore, Jr. and Michael C. Puzio, M&M's Exploration Manager, have provided reports regarding the success of and revenue anticipated by completing a well on the Straight Line Prospect using the proprietary data in question. *R. 86, Exhs. A,B,C.* The experts agree that the probability of success of the well planned by M&M was 70-80 percent. *Id.* More particularly, Robbins states that M&M has completed 84.6% of the wells they chose to drill in the area in question, which is considered an extremely high probability with very low risk. *Exh. A*. Gore opines that as of May 11, 2007, the present value attributable to the prospect, discounted at 10% of the recoverable reserves, was $50,242,360. *Exh. B*. In a letter to M&M, Puzio states that M&M paid "nearly 12 million dollars" for the proprietary data. Puzio further states that he is "extremely" confident that the proposed Straight Line Prospect is "exactly the same

productive zone drilled in the Excalibur 22 #1 well, although separate," and therefore, the likelihood of a successful well is very high. *Exh.C,*

The record also contains an affidavit by Robbins and a Quest Valuation based on economic projection, which show that Quest valued the Straight Line Prospect at a gross value of $132,000,000 for the first of two proposed wells. *Exh.F; G.* The Quest Valuation shows a net value after costs of $79,000,000 for the first well. *Exh.G.* In his affidavit, Robbins states that the "anomaly" on the seismic was exactly the same for the successful 22-1 well as it was for the Straight Line Prospect. *Exh. F, 47:6-16.* Robbins further states that "Excalibur, through its subsidiary, was willing to buy a participating [interest] in the prospect, which would have cost Excalibur more than one million dollars based on Quest's costs estimates." *Id., ¶39, 41.*

In his deposition testimony, Robbins stated that even though M&M did not use the data to drill the Straight Line Prospect it still had a value because "[y]ou can sell the data to somebody who does have the ability." *Robbins' Depo., 87:10-25, 88:1-5.* Robbins also stated that by leasing the Straight Line Prospect to Quest, after Quest had received and analyzed the data, Excalibur and Quest "took a few more dollars and put it in their pockets." *Exh. F.* In his expert report, Robbins opines that the incremental benefit to Excalibur was $21,220,150. *Exh. A.*

Both Excalibur and Quest contend that in order for M&M to meet its burden of proof that Excalibur's and Quest's actions caused M&M to sustain damages, M&M must have completed a successful well. Because a well on the Straight Line Prospect was never drilled by either M&M or Quest, they argue that their motions to dismiss M&M's claims for damages should be granted. Defendants cite state and federal jurisprudence in support of their position: *Coon v. Placid Oil Company*, 493 So.2d 1236 (La.App. 3d Cir 19860; *Breaux v. Pan American Petroleum Corporation*, 163 So. 2d 406 (La.App. 3d Cir 1964); *Aladdin Oil Company v. Rayburn Well Service, Inc.*, 202 So.2d 477 (La.App. 4 Cir 1967); *Huggs, Inc. v. LPC Energy, Inc.,* 889 F.2d 649 (5th Cir 1989). While the facts of these cases are distinguishable from those in this case, the Court finds *Huggs, Inc. v. LPC Energy, Inc.,* 889 F.2d 649 (5th Cir. 1989) instructive in determining whether or not M&M's claims for damages should be dismissed.

In *Huggs*, the trial court granted the plaintiffs damages for lost profits and lost royalties where the defendant operator allowed a lease to expire by failing to recommence drilling or reworking operations within ninety days after the cessation of production from a well. *Id.* at 656. Defendants objected to the damages award as being too difficult to ascertain to the required degree of legal certainty. *Id.* In considering that *Huggs* involved a closed well, the Fifth Circuit noted that the trial

court correctly relied on plaintiffs' expert testimony which included data evaluated from the formerly producing well, and chose to accept only the "most conservative and most accurate data" in determinating the amount of damages to award. *Id.* at 656-57. In affirming the trial court's award of damages related to the closed well, the Fifth Circuit stated that "Louisiana courts allow awards of damages for lost profits in oil and gas cases if the plaintiff proves such damage by a preponderance of the evidence. *Breaux v. Pan American Petroleum Corp.*, 163 So.2d 406 (La.App. 3rd Cir.), *writ denied*, 246 La. 581, 165 So.2d 481 (1964); *Bailes v. United States Fidelity & Guaranty Co.*, 512 So.2d 633 (La.App. 2nd Cir.1987). " *Id.* at 657.

Excalibur and Quest cite *Aladdin Oil Company v. Rayburn Well Service, Inc.*, 202 So.2d 477 (La. App. 4th Cir. 1967) as holding that the value of oil and gas lost in a blowout well was rejected by the court as insufficient. The *Huggs* court distinguished the facts of *Aladdin* in that the *Huggs'* expert based the damages on tests from the formerly producing well whereas *Aladdin's* expert could not test the blownout well, the blownout well was located in a salt dome region, and the advances in technology in the twenty years since *Aladdin* gave *Huggs'* expert's tests more accuracy. *Huggs* at 657.

While this case does not involve test data from a formerly producing well, it does provide the seismic data which M&M has successfully relied on in completing

seventy to 80 percent of the wells drilled in the prospect area. M&M's expert opines that Excalibur 22 No. 1 well, which was successfully drilled as a result of the seismic data findings, is located immediately adjacent to the Straight Line Prospect and into the same zone as 22 No. 1 well.

Based on the experts' opinions and testimony, as well as the applicable jurisprudence, the Court finds that M&M has established that an issue of material fact exists and that a jury could conclude that M&M is entitled to damages from Excalibur and Quest.[2]  Therefore, Excalibur's and Quest's motions will be denied.

---

[2] In light of the denial of Quest's motion, the Court need not address Quest's contention that its compliance with an injunction and willingness to enter into a permanent injunction to return the alleged proprietary data should weigh against M&M's damage claims.