RECEIVED

ⁿₒᵤ 4 2009 ᵒᵛᵟ

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

MAYNE & MERTZ, INC.                          CIVIL ACTON NO. 6:06-cv-00800

VERSUS                                                JUDGE DOHERTY

QUEST EXPLORATION, LLC AND         MAGISTRATE JUDGE METHVIN
EXCALIBUR LAND COMPANY, INC.

## MEMORANDUM RULING

Currently pending before the Court are two motions for summary judgment. The first motion

was filed by defendant Quest Exploration, LLC ("Quest") and seeks dismissal with prejudice of all

claims filed against it by plaintiff Mayne & Mertz, Inc. ("M&M"). [Doc. 145] The second motion

was filed by Excalibur Land Co. Inc. ("Excalibur") and Texas Tea LLC ("Texas Tea") and also seeks

dismissal of all claims brought against those entities by M&M. [Doc. 152]

### I.  Factual Background

Plaintiff Mayne & Mertz is an oil and gas exploration and production company.  Defendant

Excalibur is a corporation which owns and manages property used for farming, timber and mineral

development. [Doc. 152-3, ¶ III]  Defendant Texas Tea is a limited liability company, formed in

2006 "to participate in investment opportunities including, but not limited to, oil and gas

investments." [Doc. 152-3, ¶ XXXI; *see also* Doc. 123, ¶ 14] Defendant Quest "is in the business

of oil and gas exploration."[1] [Doc. Nos. 124, ¶ 13; 125, ¶ 13]

---

[1]According to Excalibur, "Quest is a small oil and gas group, and a new competitor of Mayne &
Mertz." [Doc. 167, p.2]

In 1995, a large tract of land in southwest Louisiana owned by the Powell Lumber Company was partitioned, and the surface ownership of portions of the property was transferred to various entities, including Excalibur, B.H. Timber, Inc., Farmers' Rice Milling Company, Inc., Agrilectric Research Company, Powell Land Development Company, Inc., Hayes Minerals, LLC ("Hayes Minerals" or "Hayes"), PWK Timberland Corporation, American Sulphur and Oil Company of Louisiana and RN Minerals. [Doc. 152-3, ¶ IV] When the surface ownership was partitioned, the mineral rights were not; rather, each of the successors retained a mineral interest in the entirety of the former Powell Lumber Company property, in proportion to their surface ownership. [Doc. Nos. 152-12, ¶ 2; 152-3, ¶ IV]

At some point prior to August of 2002, M&M began exploring oil and gas prospects in Calcasieu Parish, Louisiana. [Depo. of Mayne, p.9; Doc. 45, Ex. 3 (Depo. of Puzio), p.7]  On August 5, 2002, M&M entered into a contract with Excalibur[2], entitled "Geophysical Permit with Option to Enter into an Oil and Gas Lease" ("Option Contract"), whereby Excalibur granted M&M "the exclusive option for a period of Eighteen (18) Months ... to acquire oil and gas lease or leases" on approximately 10,000 acres of Excalibur property. [Docs. 152-3, p.12; 167, pp. 2, 3; 152-2, p.2] The contract additionally provided:

> Mayne & Mertz, Inc. shall have the right to pay to Grantor, on or before the end of said 18 month initial term, an additional $40.00 per net acre for all or any portion of such acreage as to which Mayne & Mertz, Inc. elects to extend the term of this

---

[2]The contract is actually between Excalibur, Farmers Rice Milling Company, Inc., Agrilectric Research Company and Nanette Noland (collectively referred to in the contract as "Grantor") and Mayne & Mertz, Inc. (referred to in the contract as "Grantee"). [Doc. 152-12, p.12] For ease of reference, and because the other parties to the contract are not involved in this matter, the Court will refer to the contract as by and between Excalibur and M&M.

2

agreement for an additional six (6) months.[3]

...

Together with the exclusive right, during said Option Period, to conduct a geophysical exploration survey on said property for the purpose of exploring same for the possible existence of oil, gas and other hydrocarbons, including Grantor giving Grantee ... all rights and permits necessary to conduct geophysical operations across said property....  Such permit is more particularly described in **"Louisiana Seismograph Permit"** marked **Exhibit "A"** and attached hereto. *To the extent that there may be a conflict between the terms hereof and Exhibit "A", the provisions of Exhibit "A" will control.*

...

7. Except to the extent that Grantee may have theretofore exercised its option hereunder, the rights and options of Grantee herein shall terminate at the end of the Option Period, without notice, demand or putting in default, and Grantee shall promptly, within a reasonable time period, execute and deliver to Grantor a recordable release hereof.

[Doc. 152-3, pp.12, 18 (bold typeface in original; italics added)][4] The Seismograph Permit (attached to the contract as "Exhibit A," *supra*) was executed the same day.[5]  The permit obligated M&M to provide the seismograph survey data to Excalibur, subject to certain confidentiality provisions.[6]

---

[3]Accordingly, the option contract expired on February 5, 2004, unless the contract was extended for an additional six months, in which case it would have expired on August 5, 2004.

[4] On the same day, M&M also entered into a substantially similar contract with Hayes Minerals. [Docs. 145-2, ¶1; 167-2, p.7] All portions of the Excalibur contract quoted above are identical to M&M's contract with Hayes, with the exception of the italicized sentence, which is absent from the Hayes contract. [Doc. 145-5]

[5]M&M and Hayes also executed a similar seismograph permit that same date. [Doc. 145-5, p. 29]

[6]The only significant difference between the Seismograph Permit executed by M&M and Excalibur and the permit executed between M&M and Hayes, is that the Hayes permit contained a confidentiality obligation which expired four years from execution of the contract, whereas the Excalibur contract is silent as to the expiration of the confidentiality obligation. [Doc. 145-2, ¶16; 167-2, p.9] All parties agree that by November 15, 2005 at the latest, M&M and Hayes mutually released each other from any further rights or obligations under the Hayes contract, including the duty to maintain the confidentiality of the seismic data. [Doc. 145-2, ¶17; 167-2, p.9]

[152-3, p.31] Following execution of the contract with Excalibur (and the contract with Hayes Minerals), M&M conducted a "geophysical exploration survey" (or seismic survey) on property belonging to Excalibur and property belonging to Hayes. [Doc. 145-2, ¶5; 167-2, p.9]

On February 4, 2004 (the day before the option contract was set to expire absent a six month extension), M&M exercised its option to enter into an oil, gas and mineral lease over a portion of Excalibur's property, consisting of 409 acres located primarily in Sections 15 and 22 of Township 10 South, Range 7 West. [Doc. Nos. 145-2, ¶ 5; 167-2, ¶ 5; 45-2, Ex. 1 (Depo. of Mayne)] M&M did <u>not</u> exercise its option at that time to lease the area contiguous to, and immediately east of, the selected 409 acres; this unleased tract later came to be known as the "Straight Line Prospect." [Doc. 152-2, p.4][7] Sometime after entering into the lease of the 409 acres, M&M had a unit formed for the Section 15/22 prospect. [Id.][8] [9]

On February 25, 2004, M&M, Excalibur, Hayes and other Powell successors executed a "Partial Release of Geophysical Permits with Options to Lease," which was recorded with the Calcasieu Parish Clerk of Court on March 10, 2004. [Doc. 45-2 (Depo. of Mayne), p. 48, ex. 4] The document reads, in pertinent part, as follows: "THAT Mayne & Mertz, Inc. ... does hereby release, relinquish and surrender to the lessors named herein, all right, title, and interest in and to those certain GEOPHYSICAL PERMITS WITH OPTIONS TO ENTER INTO OIL AND GAS LEASE

---

[7]It appears M&M did not exercise its option to enter into any other leases with Excalibur, other than the 409 acres noted above. [Depo of Mayne, pp. 47-8]

[8]By February 11, 2005 (approximately one year after exercising its option), M&M had completed a well on the property, referred to as the "Excalibur 22 #1 well." [Doc. 45-2, Ex. 3 (Depo. of Puzio), p.38] The well began producing minerals the following month. [Id.]

[9]As a result of the seismic survey, M&M also entered into other mineral leases with property belonging to landowners other than Excalibur. [Depo. of Mayne, p. 46] M&M drilled approximately three to five wells on non-Excalibur property, in addition to the Excalibur 22 #1 well. [Id. at 46-7]

shown on Exhibit 'A', attached hereto and made a part hereof covering lands located in the Parish

Of Calcasieu, State of Louisiana." The following page reads in pertinent part as follows:

Attached to and made a part of that certain
Partial Release of Geophysical Permits with Options to Lease
Dated February 25, 2004

SUGAR CANE PROSPECT

...

SEISMIC OPTION/LEASE dated 08/05/2002, by and between EXCALIBUR LAND
COMPANY INC., FARMERS RICE MILLING COMPANY INC, AGRILECTRIC
RESEARCH COMPANY & NANETTE NOLAND - THE POWELL GROUP, as
Grantor, and MAYNE & MERTZ INC, as Grantee, recorded on 08/23/2002, for
which A MEMORANDUM OF GEOPHYSICAL PERMIT WITH OPTION TO
ENTER INTO OIL AND GAS LEASE has been recorded at Entry 2595941, of the
records of Calcasieu Parish, Louisiana (17L00-0033-001), LESS AND EXCEPT, and
there is specifically reserved unto Grantee, 80 acres, more or less, being described as
the SE/4 of the NE/4 and the SE/4 of Section 7, T010S-R006W, Calcasieu Parish,
Louisiana.

...

SEISMIC OPTION/LEASE dated 08/05/2002, by and between HAYES MINERAL
[sic], L.L.C., as Lessor, and MAYNE & MERTZ INC, as Lessee, recorded on
08/23/2002, for which A MEMORANDUM OF GEOPHYSICAL PERMIT WITH
OPTION TO ENTER INTO OIL AND GAS LEASE has been recorded at Entry
2595944, of the records of Calcasieu Parish, Louisiana (17L00-0035-000)[10]

[Id.] The acreage released encompassed that area known as the Straight Line Prospect.

On May 13, 2004, M&M filed a petition for injunctive relief against Excalibur in state court,

alleging Excalibur was improperly denying M&M access to the 409 acres of leased property. [Doc.

152-6] Excalibur states the suit settled after M&M complied with its obligation to provide a

---

[10]According to Excalibur, "Following a dispute over AVO processing, M&M again released
Hayes Minerals from all obligations under the seismic permit [including the duty to maintain the
confidentiality of the seismic data] by letter agreement dated October 28, 2005." [Doc. 152-12, ¶ 24; see
also Doc. 152-11, Ex. V] M&M argues Hayes was not released from its obligations until November of
2005, when M&M signed the October 28 letter agreement from Hayes. [Doc. 167-2, p.5, ¶ 24]

performance bond covering any restoration and/or damage which might occur on Excalibur's property as a result of drilling. [Doc. 156-3, ¶ XIII] As noted earlier, ultimately M&M drilled a productive well (known as the "Excalibur 22-1 well") in Section 22 of the leased acreage. [Id.; Doc. 152-2, p.4; *see also* Doc. 45-2, Ex. 1 (Depo. of Mayne)]

In August of 2004, Excalibur and M&M began discussing whether the unit which M&M had created for the Section 15/22 prospect should include additional, unleased acreage to the south, also owned by Excalibur (the "Southern Acreage").[11] [Docs. 167, p.9; 152-2, p.5]  On September 23, 2004, M&M sent a letter to Excalibur stating in pertinent part as follows:

> Subsequent to selecting lands to lease pursuant to the option to lease covering Excalibur et al. ("ELC") lands, Mayne & Mertz, Inc. has drilled a well capable of producing in paying quantities.  While we believe that our productive area is entirely on our lease between Excalibur Land Company, as Lessor, and Mayne & Mertz, Inc., as Lessee, dated 2/4/2004, ("Lease") we are willing to consider proposing a unit that would encompass currently unleased Excalibur land (approximately 17% of unit area) [*i.e.* "the Southern Acreage"] as shown on the attached plat, subject to reaching agreement on several issues in the area, as follows:
>
> > 1.  Excalibur would grant to Mayne & Mertz, Inc., an oil, gas & mineral lease at no cost, containing the same terms as the Lease on any currently unleased land included in a unit for the Mayne & Mertz, Inc. Excalibur 22 #1 well, located in Section 22, T10S-R7W, Calcasieu Parish, Louisiana.  Such lease would have the same termination date as the current lease covering portions of Sections 15 and 22, T10S-R7W.
> >
> > ...
> >
> > 3.  In the event Mayne & Mertz desires to acquire an oil, gas & mineral lease on lands owned by Excalibur, such lease shall be granted for the consideration of $250 per acre bonus and rentals, ¼ royalty and a 2 year primary term using the same form as the Lease.
> >
> > ...

---

[11]It appears Excalibur was the sole owner of the surface property and had exclusive mineral rights over the unleased southern acreage. [Doc. 167-4, Ex. J]

> If the foregoing meets with your approval, please so indicate by dating, signing and returning one (1) copy of this letter to the undersigned within ten (10) days from the date hereof. If you wish to discuss this proposal, please call me at ....

[Doc. 152-7; *see also* 152-2, p.5] At the bottom of the letter, Nanette Noland's signature appears

on behalf of Excalibur; there is no date accompanying the signature. [Id.; *see also* Doc. 8, p.6]

After M&M provided notice that it intended to seek a revised unit with the Commissioner

of Conservation which would include the southern acreage referenced above, a "pre-application

conference" was held on November 10, 2004, as required by the La. Mineral Code. [Doc. 45-2

(Depo. of Mayne), Ex. 6] After opposition was expressed and counterplans were submitted by certain

other landowners (i.e. the Powell Group and Hayes Minerals), "all parties presenting unit proposals

resolved differences [by] agreeing to a somewhat larger unit... ." [Id.] Ultimately, M&M proposed

a revised unit to the Commissioner of Conservation which encompassed 9% of Excalibur's acreage

(approximately 36 acres), rather than 17%. [Id.] Shortly thereafter, the unit was approved, and

Excalibur and M&M entered into a mineral lease covering the additional 36 acres. [Id. at 7, 9]

On February 3, 2005, M&M sent a letter to Excalibur, stating in pertinent part as follows:

> Per our telephone conversation and emails, Mayne & Mertz, Inc. respectfully requests a lease on lands in the captioned sections. The lands cover approximately 409 acres in said sections, as shown on the plat enclosed herewith.

> Per our agreement, Mayne & Mertz, Inc. offers $250 per acre bonus and rental and 25% royalty for a three year primary term lease utilizing the form of lease previously used for the lands on which Mayne & Mertz, Inc. drilled the Excalibur 22 #1; unless agreed to other wise [sic].

> Your early response will be greatly appreciated. Please call if you have any questions or wish to discuss this proposal. You can reach me at ....

[Doc. 152-8, p.1] The 409 acres referenced above (upon which M&M requested a lease) is that area

east of and contiguous to the Section 15/22 property – *i.e.* the Straight Line Prospect. [Id.; *see also*

Doc. 152-2, p.5; 153-3, p.6]

On February 7, 2005, M&M sent an email to Tom Spies of Excalibur, stating: "Tom, we would like to start surveying the location on the new lands on which we had requested a lease. Has Nanette had a chance to look at the request yet?" [Doc. 167-4, p.19] The following day, Mr. Spies responded, stating:

> I did receive your request (via fax) on Thursday. Nanette has been provided copy, but has been out of the office for the past week. I don't expect her back in, until Friday of this week....at the earliest. At that time, I will attempt to get feedback as to how she'd like all of this handled.

[Id.] Dennis Sharp (M&M's landman who had negotiated the contracts and leases with the landowners on this project) responded later that day, "Thanks, I'll wait to hear from you." [Id.]

On February 28, 2005, M&M again wrote to Excalibur, stating as follows:

> Re:  Revision to Lease Request
>      dated February 3, 2005
>      Section 14 and 23, T10S-R7W
>      Calcasieu Parish, Louisiana
>      (Straight Line Prospect)

Dear Mr. Spies:

> Reference is made to the subject lease request submitted by Dennis Sharp via letter dated February 3, 2005.

> We have delineated additional prospective acreage to the east and would like to have such acreage included in the lease as requested above.

> The "revised" lease description would be as follows:

> ...

> Pursuant to the terms of our agreement of February 23, 2004, Mayne & Mertz, Inc. offers $250 per acre bonus and rental and 25% royalty for a two year primary term utilizing the form of lease previously used for the lands on which Mayne & Mertz, Inc. drilled the Excalibur 22 #1 well.

Thank you for your consideration of this proposal and I look forward to consummating this trade at your earliest convenience. You may contact me at ....

[Doc. 167-4, p.22] Excalibur never responded to M&M's offer. [Doc. 35-3, ¶16]

In May of 2005, Tom Spies of Excalibur was contacted via email by J. Burton Angelle Jr. of Quest Exploration, LLC ("Quest"), who stated as follows:

Dear Tom,

Your name and address was given to us by Mr. Dennis Sharp as the person to establish contact.[12] We are interested in exploring the possibility, as a consultant, to evaluate the Seismic data on [a] portion of your acreage in 10S-7W, Calcasieu Parish, La.

If you are interested in a prompt evaluation and possible lease offer, please let me know at your earliest convenience.

[Doc. 15, Ex.6]

On May 19, 2005, Quest sent a letter to Ed Giering (Excalibur's in-house counsel) stating in pertinent part as follows: "Thank you for your letter of May 12, 2005 expressing your interest in allowing Quest Exploration to review certain 3-D seismic data as a consultant to The Powell Group. We are agreeable to all the conditions set forth in your letter of May 12, 2005." [Doc. 15, Ex. 7] On June 16, 2005, Quest and Excalibur entered into a Non-Disclosure and Confidentiality Agreement, whereby Excalibur agreed to provide the 3-D seismic data to Quest, "as a consultant retained by [Excalibur] for the purpose of performing an interpretation, reprocessing or reformatting for [Excalibur] ...." [Doc. 15, Ex. 11] The disclosure was subject to the following terms and conditions:

---

[12]At some point prior to the e-mail, Dennis Sharp had terminated his employment with M&M. After terminating his employment with M&M, Mr. Sharp approached Mr. Angelle, provided him with a copy of the well log for the Excalibur 22 #1 well, and told him the adjacent acreage (i.e. the Straight Line Prospect) remained unleased. (Mr. Sharp and Mr. Angelle met in 1973 while working for Texaco and remained friends thereafter.) [Sharp depo, pp. 55-57]

>Said data is hereby made available to Receiving Party [Quest] as a consultant retained by Disclosing Party [Excalibur] for the purpose of performing an interpretation, reprocessing, or reformatting for Disclosing Party, provided that Receiving Party executes and delivers to Disclosing Party this Agreement, whereby Receiving Party agrees (I) to maintain the data in the strictest confidence and not to disclose the data or the adaptations, reprocessings, or reformattings derived therefrom to any other person and not use it for any purpose other than its work for Disclosing Party, and (ii) that the data shall not be removed from Receiving Party's premises or be shown or transmitted to any person in any form or via electronic transmission from any location.  Receiving Party is clearly recognized as a bona fide consultant, or as a bona fide geophysical processor, within the oil and gas industry.

The agreement further provides it "shall not be construed as establishing ... any grant of rights or licenses to the Receiving Party or any relationship between the parties"; all information "shall remain the property of the Disclosing Party" and must be returned to Excalibur "[i]f either party elects not to pursue any further business undertaking"; and the Agreement "shall terminate five (5) years from the effective date of this Agreement." [Doc. 15, Ex. 11]

On June 17, 2005, Mr. Angelle emailed Mr. Giering, stating (in pertinent part) that Quest was copying the data and would return the original tapes the following week. [Id. at Ex. 8]  He further states, "Of all the logs you gave us, we are missing an 'induction log.'  It is by far the most critical log necessary to analyze the area.  Please double check your files for a copy.  Certainly Mayne & Mertz would not have intentionally not supplied you with the one log that is indicative (?)."  Mr. Angelle concludes by stating within the next two weeks, Quest would like to "convene another meeting to share our thoughts and interpretations thus far.  Possibly your geological consultant could attend."

On June 20, 2005, Quest sent correspondence to geophysicist Steve Anderson, advising him Quest had entered into a non-disclosure and confidentiality agreement with Excalibur; pursuant to the agreement Quest was in possession of "certain confidential and proprietary information and data

10

on lands of Excalibur ... [which] is considered by the parties to be secret and confidential and constitutes a valuable commercial asset"; and that Quest sought "to enter into a Consulting Agreement with you [Mr. Anderson] to make an evaluation of the confidential information." [Doc. 15, Ex. 12] The letter further states if Mr. Anderson would agree to be bound by the non-disclosure and confidentiality agreement, Quest would retain him "to perform consulting and technical services for interpretation of the confidential information" at a compensation rate of $95.00 per hour. [Id.] Mr. Anderson accepted the offer the same day.

On June 21, 2005, Mr. Angelle emailed Dennis Sharp, stating:

> D,
> I got the log. Looks great. We are excited. We should have 3D picture next week. Can we now buy a lease from The Powell Group, or do we have to wait till Feb?
>
> We will probably try to draw Nanette in by offering her an equity position, maybe a carry to casing on ground floor level, or a WI APO. Any other thoughts?
>
> B

[Id. at 9] Mr. Sharp responded the same day, stating:

> No need to wait on leases until Feb, 2006. The option expired Feb. 2004 and no further obligation was in place except not to give or sell the seismic other than to a consultant for Excalibur. I have emailed Ed to get a fax of the provisions for further clarity. If you offer a carry to casing point, start low. None of them have any O&G experience and a small carry will seem larger to them. Make sure it is a NETTED working interest. You don't want to have to collect from Nannette [sic] if she is on the outs with you and that doesn't take much. Collect any WI from her revenue before disbursing.

[Id.]

On July 5, 2005, Jerry Perret (a Petroleum Geologist retained by Excalibur) sent an email to M&M requesting additional data to enable him to properly load and view the seismic data. [Doc. 152-9, Ex. N] Later that day, Mr. Giering sent an email to M&M asking M&M to "[p]lease lend all

possible assistance to our consultant, Jerry Perret, in this regard, as he is presently verifying that the data supplied by Mayne & Mertz at the completion of the Sugar Cane 3D prospect is consistent with those items which were required to be supplied pursuant to the Louisiana Seismographic Permit issued to Mayne & Mertz in August 2002." [Id.]   The following day, M&M forwarded Mr. Perret's email request for data to M&M's geophysical manager, Erick Nefe, and stated: "Erick ... please review and get with me in order to answer this gentleman's questions.  We need Excalibur's cooperation on several prospects!" [Id.]  Later that day, the requested data was forwarded to Mr. Perret and Excalibur. [Id.]  On July 12, 2005, Mr. Giering sent another email to M&M, wherein he stated: "In addition to Mr. Perrett, we are having our 3D seismic data reviewed by a third-party geophysicist."  He further requested additional data to enable the consultant to properly load and view the data.

On August 12, 2005, Burt Angelle of Quest sent an e-mail to Dennis Sharp, stating: "Are you sure you want us to proceed, knowing M&M will probably be very upset when they know I am involved?  Do you think you have any liability?" [Doc. 152-9, Ex. P]  Mr. Sharp replied on August 14, 2005:

> M&M will probably be upset, but they have had their seismic used by others before that was gotten from landowners. ... I know that Mayne & Mertz will be pissed but I don't see how they can control the situation.  The language in the permit clearly allows the landowners to have consultants review the data for the landowners.  Your lease offers are clearly on Excalibur land.  I think your idea of cancelling the consultant agreement and returning the data before taking leases from other than Excalibur will be a good step.

[Id.]

On August 18, 2005, Quest sent correspondence to Excalibur, stating in pertinent part as follows:

Attached is a report and proposal from Quest Exploration on the acreage we have been analyzing. We will go into the details tomorrow in our meeting in your office.

With prices of natural gas approaching $10 per mcf, it is an ideal time to get a well drilled on 100% Excalibur acreage. Quest is ready and able to drill such an exploratory well.

You will note Paragraph No. 5 mentions a statement is submitted for our services. Please disregard this sentence for the present. It will not come into play unless Excalibur later grants us a lease. Our lease offer of $520 per acre bonus consideration takes this into account. Our offer is for $500 per acre annual rentals.

We look forward to presenting our interpretations to the Powell Group. We also look forward to a time of discussing this proposal.

[Doc. 152-9, Ex. R]

On August 19, 2005, Quest sent another letter to Excalibur, stating in pertinent part as follows:

Quest Exploration, LLC, under the terms of the Non-Disclosure and Confidentiality Agreement dated June 16, 2005, became a consultant to Excalibur Land Company concerning certain lands in Calcasieu and Jeff Davis Parishes, Louisiana.

Under the terms of said Agreement, Quest Exploration, LLC received certain 3-D seismic data and well information from Excalibur Land Company.

At this point in time, Quest has analyzed only a portion of the data. Our interpretations are being presented today and are depicted on the enclosed maps.

We have appreciated this opportunity to serve as consultants to Excalibur. The presentation today of our interpretation completes the initial phase of our consultancy. A statement for our services is enclosed.

We have, in the process, developed a drilling idea which is 100% on Excalibur lands and would now like to make a proposal, not as your consultant, but as a potential development partner.

Quest Exploration proposes to continue to work with Excalibur land Company and develop a strategic plan for the orderly development of potential oil and gas resources over these lands as follows:

## PHASE 1

The initial phase would entail Excalibur Land Company granting to Quest Exploration the rights to explore and produce on the following acreage:

500 acres
Sections 14 and 23, T10S-R7W
Calcasieu Parish, Louisiana
(See attached map)

Quest would agree to apply for a Commissioner's unit consisting of 100% Excalibur acreage before the test well is drilled.

We propose the terms of the agreement to be as follows:

1)  Cash payment to Excalibur - $250 per acre
2)  Annual rentals - $500 per acre
3)  Royalty to Excalibur - 27% escalating to 30% at payout
4)  Excalibur would have the option, but not the obligation, of participating in drilling of the well up to a 5% working interest on a ground-floor basis.
5)  Should Excalibur elect to participate as a working interest owner, they could apply any portion of the cash payment in No. 1 toward their cost of the well.

## PHASE 2
### (Optional)

The next phase of the joint development plan is optional and is at the discretion of Excalibur Land Company. Quest Exploration, LLC would continue to analyze and interpret the 3-D seismic data over other Excalibur lands.

Excalibur would, at such time it agrees to Quest continuing to develop its acreage, grant to Quest a first right of refusal on its acreage. Quest would continue its work of developing other areas for additional wells on Excalibur lands.

As additional potential drillsites are developed, Quest would make its proposals in a presentation to Excalibur, fully disclosing its plans and strategies to maximize Excalibur equity.

The terms of the trade for any additional well(s) would be similar to the terms in Phase 1 mentioned above.

Excalibur would then have the option of accepting the lease proposal and, further, whether it wanted to participate as a working interest owner.

This procedure would continue in time until the lands are fully developed.

...

ADDITIONAL CONSIDERATION

After the initial well(s) are drilled under Phase 1, should Excalibur desire to more fully participate as a working interest owner in any additional wells, Quest Exploration would be willing to enter discussions of forming a new entity, perhaps named Excalibur Oil Company, LLC, wherein Excalibur and Quest would jointly develop your acreage on some equitable basis.

[Doc. 15, Ex. 15] The proposed lease, referenced in "Phase 1" *supra*, was for "precisely the same acreage that Mayne & Mertz was seeking to lease from Excalibur" - *i.e.* the Straight Line Prospect. [Doc. 167, p.8][13]

On January 9, 2006, Excalibur and Quest executed an oil, gas and mineral lease for the Straight Line Prospect. [Doc. 145-2, ¶8; 167-2, p.7] The foregoing lease has now expired, and Quest executed a release of the lease on March 2, 2007. [Doc. 145-5, Ex. 7]  Quest never drilled a well on the leased property.  [Doc. 145-2, ¶13; Doc. 167-2, p.9; Doc. 167-1, p.23] Additionally:

Pursuant to an injunctive agreement between Quest and Mayne & Mertz, Inc. ("Mayne"), Quest has returned to Excalibur all copies in its possession of the seismic data ... . Pursuant to the same injunctive agreement, Quest has promised to make no use of the subject seismic data, or any information derived therefrom.  Quest has also promised to maintain the confidentiality and secrecy of the subject seismic data.

---

[13]According to M&M,

After it had obtained and reviewed the seismic, Quest went out to its own investors with its seismic interpretations.  Its prospectus to those investors was expressly based on 'analysis of the 3-D seismic.'  Further, the evidence indicates that Quest actually showed the seismic itself to those investors, after making them 'consultants' as well.

[Doc. 167, p.7] M&M has provided no evidentiary support for the last sentence quoted above. [Id.; *see also* Doc. 18-2, p.6]

[Doc. 145-5, Ex. 8]

On November 1, 2007, Excalibur executed a mineral lease with Rock Creek Ranch II, LLC [Doc. 145-2, ¶20; Doc. 145-5, Ex. 4; Doc. 167-2, p.10] Thereafter, Rock Creek Ranch and Gordy oil drilled a successful well on the Straight Line Prospect "without using any of the seismic data provided by M&M to Excalibur." [Doc. 152-12, ¶ 22; *see also* Doc. 145-2, ¶22; Doc. 167-2, p.10] "Rather, [Rock Creek and] Gordy Oil used the exact same seismic data which had been provided by M&M to Hayes Minerals and over which M&M had released all confidentiality obligations." [Doc. 152-12, ¶ 22][14]

On May 15, 2006, M&M filed a Complaint in the Western District of Louisiana alleging "Excalibur misappropriated the trade secrets of Mayne & Mertz when it divulged the 3-D Seismic to Quest," and that "Quest also misappropriated the trade secrets ... by obtaining the 3-D Seismic from Excalibur."[15] [Doc. 123, pp. 9-10] M&M additionally asserts claims for unfair trade practices against Excalibur, Texas Tea and Quest, a breach of contract claim against Excalibur, and a claim for unjust enrichment against Quest and Texas Tea.[16]

---

[14]Although M&M denies Excalibur's assertion (contained in its statement of undisputed facts) that Rock Creek Ranch and Gordy Oil drilled their well by utilizing the Hayes seismic data (*i.e.* the same data provided to Excalibur), M&M's "denial" is ambiguous and appears to be more of an admission. M&M responds as follows:

> Denied as written. Mayne & Mertz understands Excalibur leased the Straight Line Prospect to a third party using the same or similar seismic data. However, the parties in possession of that seismic data were under different confidentiality obligations than Excalibur was.

[Doc. 167-2, ¶ 22]

[15]The matter was pending before Judge Melancon for almost three years. It was transferred to this Court upon Judge Melancon assuming senior status. [Doc. 129]

[16]As referenced earlier, following the filing of this lawsuit, M&M and Quest entered into an injunctive agreement, whereby Quest agreed to return all copies of the seismic data provided to it by Excalibur, and additionally agreed to make no further use of the data. [Doc. 145-2, ¶14; 167-2, p.9]

16

## II. Applicable Law and Analysis

### A. Summary Judgment Standard

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. PROC. 56(b).  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PROC. 56(c).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

FED. R. CIV. PROC. 56(e).

As summarized by the Fifth Circuit in Lindsey v. Sears Roebuck and Co., 16 F.3d 616, 618 (5th Cir. 1994):

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Id. at 322; see also, Moody v. Jefferson Parish School Board, 2 F.3d 604, 606 (5th Cir.1993); Duplantis v. Shell Offshore, Inc., 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The Supreme Court has instructed:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

Lujan v. National Wildlife Federation, 497 U.S. 871, 884 (1990)(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).  The Court later states:

> In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence set forth specific facts showing that there is a genuine issue for trial. The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

Id. at 888-89 (1990)(internal quotations and citations omitted).

The Fifth Circuit has further elaborated:

> [The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence.  We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.  We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)(citations and internal quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." Id. To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." Roberts v. Cardinal Servs., 266 F.3d 368, 373 (5th Cir. 2001).

**B. Breach of Contract[17]**

In Excalibur's motion for summary judgment, it first seeks dismissal of M&M's claim "that Excalibur breached a contract to lease the Straight Line Prospect to M&M for mineral exploration." [Doc. 152-2, p.13] In its opposition memorandum, M&M argues "it had a binding agreement with Excalibur to lease additional Excalibur lands located in the South Manchester area of Calcasieu Parish." [Doc. 167, p.8] M&M states its "position is based upon its September 23, 2004 Letter Agreement with Excalibur - a fully negotiated offer from Excalibur that was never revoked and that Mayne & Mertz accepted timely." [Id. at 8-9] In response, Excalibur argues the September 23 letter is not a valid contract. [Doc. 152, p.13]

The Court finds Excalibur is correct. Pared down to its essential elements, the September 23 letter purports to memorialize the following agreement:[18]

1.  M&M would be "willing to consider proposing a unit" that would cover certain unleased acreage belonging to Excalibur, thus increasing Excalibur's share of ownership interest in the unit to 17%, "subject to reaching agreement on several issues ... as follows:"

    A.  If Excalibur would grant M&M a lease over the additional property at no cost, with all other terms being the same as those contained in the previous lease between M&M and Excalibur, *and if*

---

[17]M&M's claim for breach of contract is asserted only against Excalibur.

[18]*See* quoted text of September 23 letter at pp. 6-7.

19

B. "In the event Mayne & Mertz desires to acquire an oil, gas & mineral lease on [any other] lands owned by Excalibur [at some unspecified future date], such lease shall be granted for the consideration of $250 per acre bonus and rentals, ¼ royalty and a 2 year primary term using the same form as the Lease."[19]

[Doc. 152-7] From the foregoing, it appears once Excalibur accepted M&M's offer (contained in the September 23 letter), a bilateral contract could have been formed which would have created one obligation on the part of M&M ("to consider proposing a [revised] unit"), and two obligations on the part of Excalibur (1 - Excalibur must lease M&M the additional property for the revised unit at no cost, and 2 - Excalibur must agree to lease any of its other property to M&M, should M&M desire such a lease on some unknown future date). M&M's obligation to consider proposing a revised unit was completed by performance - namely, M&M applied for and received a revised unit from the Louisiana Commissioner of Conservation on January 11, 2005.[20] Excalibur's first obligation was completed the same day. [Doc. 45-2, Ex. 9 (Memorandum of Oil & Gas Lease for the additional 36 acres contained in the revised unit, effective January 11, 2005)] Accordingly, the only remaining question is whether or not Excalibur breached the possible contract by failing to grant M&M an additional mineral lease, once M&M expressed its "desire" to enter into such a lease on the Straight Line Prospect. This Court finds Excalibur did not breach a contract, as will be explained below. Rather, the Court finds the obligation to lease the Straight Line Prospect to M&M is null and void by law.

---

[19]The Court notes the only significant difference between proposal "B," *supra*, and the terms contained in the original geophysical permit is that proposal "B" contains no term during which M&M must exercise its option to lease. [Doc. 152-3, p. 7 (the original option contract includes an 18 month term to exercise the option)]

[20]Although M&M was unable to obtain a revised unit conforming to the terms of the September 23 letter (*i.e.* consisting of 17% of Excalibur's land), nevertheless a revised unit consisting of 9% of Excalibur's land was formed. Excalibur does not argue M&M's failure to obtain a unit consisting of 17% of Excalibur's property constituted a breach of contract. [Doc. 45-2, Ex. Nos. 6, 7]

In essence, the obligation contained at "B", *supra*, is an invalid option contract.  LA. CIV. CODE art. 1933 provides, "An option is a contract whereby the parties agree that the offeror is bound by his offer for a specified period of time and that the offeree may accept within that time."[21] Because the September 23 letter containing the option contains no term for performance (*i.e.* a period of time during which M&M must exercise the option or lose its right to do so), the option is null and void for failure to stipulate a time period for the acceptance of the promise to lease.  In Bristo v. Christine Oil & Gas Co., 71 So. 521, 522 (La. 1916), the Louisiana Supreme Court held an option to enter into mineral lease is void where the parties have failed to provide a term during which the option must be exercised, reasoning:

> To recognize that the defendant has the right, without any obligation, to hold the plaintiff's land under a perpetual lease or option, would take the property out of commerce, and would be violative of the doctrine of ownership, defined in the ... Civil Code.
>
> ...
>
> We rest our decision in this case ... upon the proposition that a contract purporting to give a perpetual option to hold land under a mineral lease is null.

*See also* Becker and Associates, Inc. v. Lou-Ark Equipment Rentals Co., Inc., 331 So.2d 474, 477 (La.1976); Clark v. Dixon, 254 So.2d 482 (La. 3rd Cir. 1971).  Additionally, the Court notes no consideration was provided for the option contract, which also would result in the option being null and void.  Moresi v. Burleigh, 127 So. 624, 626 (La. 1930)(consideration is required for an option

---

[21]The essential difference between an option and an irrevocable offer (which must be accepted within "a reasonable time" if no term is specified) is that an option "may be assigned and ... gives rise to rights and obligations that devolve upon the parties' heirs when not personal to the parties," whereas "an irrevocable offer is not assignable, and ... it expires at the death of either the offeror or the offeree." LA. CIV. CODE art. 1933, comment (b).  In this matter, the seismograph permit (as well as the La. Civil Code) provides, "All provisions hereof shall extend to and bind the successors and assigns of Grantor and shall also extend to and bind the partners, successors and assigns of Grantee." [Doc. 152-3, § 25]

contract; because option contracts were adopted from common law, common-law precedents and concepts, such as consideration, are applicable).[22]

## C. Misappropriation of a Trade Secret[23]

M&M alleges "Excalibur misappropriated the trade secrets of Mayne & Mertz when it divulged the 3-D Seismic to Quest," and that "Quest also misappropriated the trade secrets ... by obtaining the 3-D Seismic from Excalibur." [Doc. 123, pp. 9-10]  Excalibur and Quest contend any obligation Excalibur had to maintain the confidentiality of the seismic data expired at the same time as the Option Contract and Seismic Permit expired - *i.e.* February 5, 2004.  Because Excalibur did not share the seismic data with Quest until June of 2005 (approximately one year and three months after the expiration of the Seismic Permit), Excalibur argues it did not breach its duty to maintain the confidentiality of the seismic data. [See Doc. 15, Ex. 8][24]  Additionally, both defendants argue

---

[22]Had M&M accepted the offer contained in the option and tendered payment for the selected acreage, the result here might be different.  *See* Moresi at 626 ("'Although an option is not binding as a contract for want of consideration, yet if the offer contained therein is not withdrawn, its acceptance within the time limited gives rise to a contract of sale, binding on the vendor, which cannot be affected by any subsequent attempt to withdraw the offer.'")(citations omitted)

[23]This claim is asserted only against Excalibur and Quest.

[24]In support of its argument that the duty of confidentiality terminated with the contract, Excalibur cites Section 11 of the Seismograph Permit.  That section provides, "The expiration/ termination of this permit shall not release Grantee from it [sic] obligations pursuant to all parts of Section 11 of this permit."  Section 11 then lists specific obligations which do not expire, *e.g.* M&M's warranty it will comply with Environmental law.  Excalibur argues, "If M&M had wanted the confidentiality provision to survive after the permit terminated, it could have provided as much in the permit itself," just as it did in Section 11.  Excalibur further argues because the confidentiality provisions contained in Section 16 have no specific term (unlike Section 11), that duty expired after 18 months, along with all other obligations contained in the permit with the exception of Section 11.

On the other hand, M&M seems to argue the confidentiality agreement would never expire, absent the data losing its trade secret status.  Although M&M has made arguments to rebut Excalibur's position that the duty of confidentiality terminated along with the contract, M&M has not argued any other specific time period applies to the duty of confidentiality.  However, M&M does state, "The confidentiality obligations contain no expiration provision," and then notes its landman and negotiator for the contract, Dennis Sharp, testified he was of the opinion the confidentiality obligation was

M&M explicitly released Hayes from its duty of confidentiality with regard to the same data on November 15, 2005. [Doc. 145-2, ¶¶ 16, 17] M&M "admits it did not release the confidentiality obligation of Hayes until November 2005... ." [Doc. 167-2, p.9, ¶ 17] M&M additionally affirms "[t]he confidentiality provision for Hayes was different than the confidentiality obligation owed by Excalibur to Mayne & Mertz in that Hayes' obligation was limited to only four years as opposed to being unending." [Id. at ¶ 16]

In order to recover damages under Louisiana's Uniform Trade Secrets Act, M&M must prove: 1) the existence of a trade secret; 2) misappropriation of the trade secret by another; and 3) actual loss caused by the misappropriation. La. R.S. 51:1431 *et seq*; *see also* <u>Computer Management Assistance Company v. Robert F. DeCastro</u>, 220 F.3d 396, 403 (5th Cir. 2000). The Louisiana Uniform Trade Secrets Act defines "trade secret" as information that:

> (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and

> (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

La. R.S. 51:1431(4). Comment (f) under this provision provides:

> Reasonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on a "need to know basis", and controlling plant access. On the other hand, public disclosure of information through display, trade journal publications, advertising, or other carelessness can preclude protection.... Reasonable use of a trade secret including controlled disclosure to employees and licensees is consistent with the requirement of relative secrecy.

---

"unending." [Doc. 167, p.5]  Accordingly, the Court presumes M&M argues the duty of confidentiality would never expire.

"'The efforts required to maintain secrecy are those reasonable under the circumstances, and courts do not require extreme and unduly expensive procedures to be taken to protect trade secrets.'" Sheets v. Yamaha Motors Corp., U.S.A., 849 F.2d 179, 183 (5th Cir.1988) (quoting Tubular Threading, Inc. v. Scandaliato, 443 So.2d 712, 714 (La.Ct.App.1983)). "A disclosure of a trade secret to others who have no obligation of confidentiality extinguishes the property right in the trade secret." Id. at 183-84.

In the instant matter, the Court finds that even if it were to find the seismic data constituted a "trade secret"[25], the seismic data would have lost its protection in 2004 due to the actions of M&M. As earlier noted, on February 25, 2004, M&M executed a document entitled "Partial Release of Geophysical Permits with Options to Lease." [Doc. 45-2 (Depo. of Mayne), p. 48, ex. 4] The Release was recorded in the conveyance records of the Calcasieu Parish Clerk of Court on March 10, 2004. [Id.] The document reads, in pertinent part: "THAT Mayne & Mertz, Inc. ... does hereby release, relinquish and surrender to the lessors named herein, all right, title, and interest in and to those certain GEOPHYSICAL PERMITS WITH OPTIONS TO ENTER INTO OIL AND GAS LEASE shown on Exhibit 'A', attached hereto and made a part hereof covering lands located in the Parish Of Calcasieu, State of Louisiana." The following page reads in pertinent part as follows:

Attached to and made a part of that certain
Partial Release of Geophysical Permits with Options to Lease
Dated February 25, 2004

---

[25]For purposes of this motion, Excalibur does not contest the seismic data constitutes a trade secret. [Doc. 152-2, p. 17] Quest argues the data is not a trade secret. The question of whether or not the seismic data in this matter constitutes a trade secret had been addressed at length by all parties, prior to the matter being transferred to this Court. There has been no final determination to date, as to whether or not the data constitutes a trade secret. However, for the reasons noted above, this Court need not make that determination at this juncture.

SUGAR CANE PROSPECT

...

SEISMIC OPTION/LEASE dated 08/05/2002, by and between **EXCALIBUR LAND COMPANY INC.**, FARMERS RICE MILLING COMPANY INC, AGRILECTRIC RESEARCH COMPANY & NANETTE NOLAND - THE POWELL GROUP, as Grantor, and MAYNE & MERTZ INC, as Grantee, recorded on 08/23/2002, for which A MEMORANDUM OF GEOPHYSICAL PERMIT WITH OPTION TO ENTER INTO OIL AND GAS LEASE has been recorded at Entry 2595941, of the records of Calcasieu Parish, Louisiana (17L00-0033-001), LESS AND EXCEPT, and there is specifically reserved unto Grantee, 80 acres, more or less, being described as the SE/4 of the NE/4 and the SE/4 of Section 7, T010S-R006W, Calcasieu Parish, Louisiana.

...

SEISMIC OPTION/LEASE dated 08/05/2002, by and between **HAYES MINERAL** [sic], L.L.C., as Lessor, and MAYNE & MERTZ INC, as Lessee, recorded on 08/23/2002, for which A MEMORANDUM OF GEOPHYSICAL PERMIT WITH OPTION TO ENTER INTO OIL AND GAS LEASE has been recorded at Entry 2595944, of the records of Calcasieu Parish, Louisiana (17L00-0035-000)

[Id.]  (emphasis added)

The Court finds by executing this document, M&M released all rights it had under the option

agreement and seismic permit, including the right to require Excalibur to maintain the confidentiality

of the seismic data covering Excalibur's property.[26] (The Court additionally notes once M&M

---

[26]The Court notes M&M has made a cursory attempt to argue the release "does not refer to seismic at all" and that the release "is plainly a release of the options, not of the right to use the data." [Doc. 167, p.22]  The Court disagrees.  First, the release plainly refers to, in all capital letters, "SEISMIC OPTION/LEASE."  Second, the Court notes both the geophysical option and the seismograph permit contain option language (*see e.g.* Seismograph Permit, p.7, "you are hereby granted a permit for a period of Eighteen (18) months from the date hereof *with the option to extend permit... .*" (Emphasis added))  Third, M&M has provided no basis in law or contract for this Court to find a duty of confidentiality (contained in a contract, with the contract being silent as to any time limitation for the duty of confidentiality to remain in effect) would survive the execution of a release of the contract itself.  Any ambiguity in the contract must be interpreted against the party who prepared the contract. Kenner Industries, Inc. v. Sewell Plastics, Inc., 451 So.2d 557, 560 (La. 1984); LA. CIV. CODE art. 2057.  Accordingly, the Court finds M&M's argument unpersuasive.  Merely of interest, although not relied upon by the Court, is the parties' discussion of the underlying offers and counter-offers regarding the term applicable to the duty of confidentiality; clearly the period of time the seismic data was to remain confidential was a focus of the parties, but for unknown reasons, no time period was incorporated into the final contract.

25

executed the release, it no longer had any use for the seismic data in relation to Excalibur's property, absent the execution of a new and independent option contract or mineral lease with Excalibur, or a sale of the data to another developer, such as Quest.) Had M&M wished to release all of its rights with the exception of its right to maintain the confidentiality of the seismic data, it certainly could have stated so in the release, just as it excepted a certain 80 acres within the release document. Accordingly, the Court finds M&M did not exert "efforts that ... [were] reasonable under the circumstances to maintain ... [the seismic data's] secrecy." La. R.S. 51:1431(4).

Additionally, it is noted M&M offered to lease the Straight Line Prospect on at least three occasions in February 2005, but Excalibur declined to accept any of those offers. In July of 2005 (approximately five months later), Excalibur sent M&M two requests for additional seismic data, and specifically noted the additional data was needed for review by Mr. Perrett, as well as a "third-party geophysicist." Rather than request any additional information as to the identity of the "third-party geophysicist" or the purpose of his evaluation (particularly here, where M&M had unsuccessfully attempted to obtain a lease on three occasions some five months prior), M&M provided Excalibur with the data, as M&M "need[ed] Excalibur's cooperation on several prospects!" Again, it does not appear M&M exerted reasonable efforts to maintain the secrecy of its data.

Finally, the Court notes M&M admits it released Hayes from its duty of confidentiality with regard *to the same seismic data* in November 2005. [Doc. 167-2, p.9, ¶ 17] However, the Court finds the release of Hayes (and Excalibur) actually occurred on February 25, 2004, as stated in the "Partial Release" quoted from above.[27]   Although M&M makes a cursory argument in its opposition

---

[27]Apparently, after execution of the partial release, a dispute arose between Hayes and M&M as to each parties' remaining rights and obligations. [Depo. of Edward Robinson] After reaching a resolution, M&M and Hayes executed a letter agreement reaffirming the release of Hayes' duty of confidentiality. However, the Court finds this was merely a repetition of the parties' understanding as to

memorandum that the partial release of February 2004 did not release Hayes' duty of confidentiality, and also attempts to argue the November 2005 release pertains to different obligations than the Excalibur release, its argument is untenable.[28]  As noted, M&M admits elsewhere that it did indeed

what rights and obligations were released pursuant to the original release. The letter agreement states in pertinent part as follows:

A.      Mayne & Mertz, Inc. will pay to Hayes Minerals, L.L.C. the sum of $39,000.00 for reprocessing; and

B.      All information concerning the seismic operation, that we [Hayes] are entitled to pursuant to our permit, has been provided to us.  Accordingly, if the information has been provided, Mayne & Mertz, Inc. would release Hayes Minerals, LLC and Hayes Minerals, LLC would release Mayne & Mertz from the Geophysical Permit With Option to Enter Into an Oil and Gas Lease Dated August 5, 2002.

[See Robinson depo., see also Doc. 145-5, Ex. 6]

[28]The entirety of M&M's argument on this issue is as follows:

Both parties also make repeated "waiver" arguments. Only one of these arguments is new. The new argument is internally contradictory and relates to a third-party. Excalibur contends that Mayne & Mertz released the data to Hayes Minerals, an entirely different party, on February 24, 2004, then again on October 28, 2005.

The argument relating to the February 24, 2004 agreement is simply fanciful. Excalibur argues that the "Partial Release" of that date somehow relieved Hayes Minerals from its obligations under the agreements, "including any confidentiality obligations" according to Exclaibur. The partial release says no such thing. It does not refer to Excalibur. It does not refer to anyone's confidentiality agreements. It does not refer to seismic at all. It is plainly a release of the options, not of the right to use the data. To argue that this "partial release" somehow freed Hayes Minerals to use the seismic data defies logic, and defies the fact that Hayes Minerals later negotiated for a different release (as set out below). To argue that by executing a "partial release" to Hayes Minerals, Mayne & Mertz somehow intended to liberate Excalibur to misappropriate its data is too far a leap of logic to sustain.

The October 28, 2005 letter comes far too late to have been of any help to Excalibur or Quest. Excalibur and Quest had misappropriated the data long before this alleged release occurred. Quest had already viewed the data and made its proposals to Excalibur based on the misappropriated data on August 19, 2005, months before the alleged "release." It is senseless to say that by releasing an unrelated party from seismic obligations, Mayne & Mertz somehow forgave misappropriations that had already occurred, and that it did not even know about until much later. Quest misappropriated the data while all of that data remained under contractual protection by anyone's test. If the data later became public, after Quest had taken it wrongfully, that does not excuse its conduct. If this position were

release Hayes from its duty of confidentiality as to the same seismic data in November. [Doc. 167-2, p.9, ¶ 17] However, M&M has failed to convince the Court that the document addressing Hayes was anything more than a reaffirmation of the first release, and it has failed to convince the Court that the release of Hayes differs substantively from the release of Excalibur.[29]  With the exception of referring to Excalibur as "Grantor" and Hayes as "Lessor," and the exception of different recordation numbers, the February release of each party contains identical language. Again, "[a] disclosure of a trade secret to others who have no obligation of confidentiality extinguishes the property right in the trade secret." Sheets at 714. Thus, once Hayes was released, any trade secret protection M&M might have had in the seismic data was extinguished.

---

accurate, anyone could misappropriate protected trade secrets, and escape liability so long as the data became public at some time in the future. This is senseless, and such a rule would gut trade secret protections.

[Doc. 167, pp. 21-22] No legal or evidentiary support is provided for the foregoing argument.

[29]Even if this Court were to find the seismic data did not lose its protected status until the November 2005 release of Hayes, M&M has failed to carry its burden and show "actual loss caused by the misappropriation." LA. REV. STAT. § 51:1433; Computer Mgmt. at 403 (third element of plaintiff's *prima facie* burden for misappropriation claim is "actual loss caused by the misappropriation"); Lindsey at 618 ("where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-monvant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial"). First, the Court notes the lease between Quest and Excalibur was not executed until January 9, 2006 - *i.e.* two months after the data lost its protected status - and thus there was no misappropriation of the data at the time of the execution of the lease. Additionally, M&M argues Excalibur and Quest actually began their discussions in May of 2005, Quest used the misappropriated data at some point between May of 2005 and January of 2006 "to obtain leases," and had Quest not misappropriated the data and entered into a lease with Excalibur, M&M would have done so, because "Excalibur committed in writing to lease to Mayne & Mertz." [Doc. 169, p.24] However, for the reasons provided in this Ruling at section "II(B)," *supra*, the Court finds this argument to be without merit. Finally, the Court notes no evidence has been submitted showing Excalibur attempted to sell the data to any third party at any time, including that period of time from May 2005 to January 9, 2006. Accordingly, the Court likely would find M&M has failed to show it suffered an actual loss caused by the misappropriation. *See e.g.* Newsouth Communications Corp. v. Universal Telephone Co., 2002 WL 31246558, *24 (E.D.La.)("There is no evidence that the misappropriation of NewSouth's trade secrets caused NewSouth to lose customers or employees, or to lose the Whitney Bank or Windsor Court accounts. Moreover, the Fifth Circuit has explicitly rejected a *res ipsa loquitur* approach to assessing trade secret misappropriation damages, under which causation is assumed if a breach and damages are proved. In this case, ... plaintiff has not offered proof of causation to link defendants' misappropriation of trade secrets with plaintiff's loss. Thus, the Court declines to award damages for trade secret misappropriation.")(citations omitted)

## D.   Unfair Trade Practices

M&M has asserted a claim for violations of the Louisiana Unfair Trade Practices Act

("LUTPA") against Excalibur, Quest and Texas Tea.  LUTPA prohibits "[u]nfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La.

R.S. § 51:1405(A).  LUTPA grants a private right of action to "[a]ny person who suffers any

ascertainable loss of money or movable property ... as a result of the use or employment by another

person of an unfair or deceptive method, act or practice declared unlawful by R.S. 51:1405...." La.

R.S. § 51:1409(A).  LUTPA's private right of action is limited to direct consumers or to business

competitors.  Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc., 220 F.3d 396, 405 (5th

Cir. 2000); Delta Truck & Tractor, Inc. v. J.I. Case Co., 975 F.2d 1192, 1205 (5th Cir. 1992).

LUTPA "is broadly and subjectively stated and does not specify particular violations."

Levine v. First Nat. Bank of Commerce, 948 So.2d 1051, 1065 (La. 2006).  "Rather, what constitutes

an unfair trade practice is determined by the courts on a case-by-case basis."  Id.  "A practice is

unfair when it offends established public policy and when the practice is unethical, oppressive,

unscrupulous, or substantially injurious."  Id.(internal edits omitted).[30]  As stated by the Fifth Circuit,

"The real thrust of the LUTPA, modeled after the Federal Trade Commission Act, 15 U.S.C. § 45,

is to deter injury to competition."  Omnitech Intern., Inc. v. Clorox Co., 11 F.3d 1316, 1332 (5th

Cir.1994)).[31]

---

[30]Additionally, three Louisiana appellate courts have held, "A defendant's motivation is a critical factor; the actions must have been taken with the specific purpose of harming the competition."  United Group of Nat. Paper Distributors, Inc. v. Vinson, 666 So.2d 1338, 1346 (La. 2nd Cir. 1996); Freeman v. Medical Systems, Inc., 2009 WL 2382149, *5 (La. 1st Cir.); Adelmann-Chester v. Kent, — So.3d —, 2009 WL 1565671 (La. 4th Cir.).

[31]The Omnitech court notes, "Louisiana courts have recognized the appropriateness of referring to federal interpretation when deciding unfair trade practices cases." Id. at 1331-32, n. 23 (citations omitted).  Accord Tubos de Acero de Mexico, S.A. v. American Intern. Inv. Corp., Inc., 292 F.3d 471,

M&M does not argue it is a "consumer" for purposes of its LUTPA claim, nor does it appear it could be considered a consumer under the statute or jurisprudence. Rather, M&M argues it was a competitor of Excalibur, Quest and Texas Tea. [Doc. 136, p. 10]  The Act does not define "competitor" or "business competitor."  However, as noted by the Fifth Circuit,

> In Federal Trade Comm'n v. Raladam Co., the Supreme Court, in addressing the meaning of business competitor in the federal statute, noted that:
>
>> It is obvious that the word "competition" imports the existence of present or potential competitors, and the unfair methods must be such as injuriously affect or tend thus to affect the business of these competitors-that is to say, the trader whose methods are assailed as unfair must have present or potential rivals in trade whose business will be, or is likely to be lessened or otherwise injured.

Tubos de Acero de Mexico at 481, n.3 (quoting Raladam, 283 U.S. 643, 649 (1931).  See also Washington Mut. Bank v. Monticello, 976 So.2d 251, 258 (La. 3rd Cir. 2008)("[T]o be considered a 'business competitor,' '[the plaintiff] must establish [she] engages in business that competes directly or indirectly with the defendant as a business competitor'")(alterations in original).

As a threshold matter, to maintain its claim under LUTPA, M&M must first demonstrate it is either a consumer or a business competitor of each defendant.  Quest does not dispute it is a business competitor of M&M.  As to Excalibur and Texas Tea, M&M argues as follows:

> Excalibur decided it would enter the exploration business as part of its deal with Quest, which directly competed with Mayne & Mertz. To do so, it used an entity known as Texas Tea, which was owned by a series of trusts that linked back to Excalibur's owner and by members of upper management of Excalibur. If the Quest lease was successful, then the senior management of Excalibur (which was part of the Powell Group) would have profited. That included the two members of Excalibur's management who were most involved in the deal in question, Mr. Giering and Mr. Spies. If Texas Tea was formed after the fact to funnel the profits of the misappropriation to management of Excalibur, which was a participant in the misappropriation, it became a participant in the prior misconduct and therefore can

---

481, n.3 (5th Cir. 2002).

be liable on that basis. Quest, Excalibur and Texas Tea joined in an effort to conceal the true nature of the transaction through the sham consultancy arrangement which allowed Quest to offer a better leasing deal to Excalibur. This deal allowed Excalibur (through Texas Tea) to become an active participant in the very exploration effort which Excalibur had promised to Mayne & Mertz. Using the seismic, Quest made a "Joint Development Proposal" to Excalibur. That proposal resulted in a participation agreement, in which senior management of Excalibur, through a series of corporations and trusts, took a profit stake in the Quest lease, and in which Excalibur itself enhanced its position considerably. Indeed, the proposal from Quest to Excalibur, which was based on the seismic, offered Excalibur additional "plans and opportunities to maximize Excalibur's equity." If Excalibur was "maiximizing [sic] its equity" by misuse of the seismic, it was competing. These facts are more than sufficient to find that Excalibur and Texas Tea actually or potentially engaged in business that competes directly or indirectly with Mayne & Mertz as a business competitor under LUPTA.

[Doc. 167, pp. 25-26] No legal authority has been cited in support of M&M's argument.

Conversely, Excalibur argues it is a landowner, whereas M&M is an oil and gas production company. Excalibur further argues it is neither a competitor nor consumer of M&M's, and therefore M&M cannot state a claim against Excalibur pursuant to LUTPA. The Court finds M&M is not a business competitor of Excalibur.  As M&M states at p.2 of its brief:

> Mayne & Mertz is in the business of exploring for oil and gas. Excalibur is a large landowner in Calcasieu Parish, Louisiana. It is part of The Powell Group, which is an even larger land, timber, and farming conglomerate. As part of that group, Excalibur owns, operates, and manages approximately ten thousand acres of land.

[Doc. 167, p.2]  Furthermore, it is difficult to envision how Excalibur could be characterized as a competitor of M&M's under these facts, as Excalibur is the owner of the very property which M&M wishes to exploit.  "Under Louisiana law, the right to explore and develop one's property for the production of minerals, and to reduce minerals to possession and ownership, belongs exclusively to the landowner." Musser Davis Land. Co. v. Union Pacific Resources, 201 F.3d 561, 564 (5th Cir. 2000)(citing La. R.S. 31:6; Frey v. Amoco Production Co., 603 So.2d 166, 171 (La. 1992)). As the landowner, Excalibur enjoyed this exclusive right and was free to convey, reserve, or lease the right.

31

Id. Because LUTPA is available only to consumers and business competitors, M&M cannot seek protection under LUTPA by alleging Excalibur developed its own property. Accordingly, M&M's claim against Excalibur for unfair trade practices must be dismissed.

Although Texas Tea argues it is not a competitor of M&M, the Court need not make that determination, for even if Texas Tea were deemed a competitor, the Court finds neither it, nor Quest, engaged in an unfair trade practice. The unfair trade practice M&M alleges is stated as follows:

> On these facts, a jury could plainly find that Excalibur joined with Quest to create a sham consultancy in order to evade the confidentiality obligations. The jury could find that Excalibur misled Mayne & Mertz about who was actually looking at the seismic data. The jury could find that Excalibur did so at the same time it was stringing Mayne & Mertz along in the belief that it would honor its obligations to give the lease to Mayne & Mertz. The jury could find that Excalibur for all practical purposes peddled the data to Quest in order to enhance its revenue interest in the lease on the lands in question. And, the jury could find this **because of**, and not in spite of, the fact that Quest was using a former employee of Mayne & Mertz to put its misappropriation plans into effect.

> It is established public policy that parties should not seek to evade their agreements through subterfuge. It is established public policy that parties should not mislead others. It is established public policy that parties should not bargain away things they have no right to sell in order to obtain increased profits. It is established public policy that parties should honor their word, rather than using schemes and artifices to negotiate better deals for themselves in spite of their past promises. Any jury could find on these facts more than enough conduct to establish something that is "immoral, unethical, or unscrupulous," which even the defendants admit is the standard.

[Doc. 167, p. 27 (emphasis in original)]

Because the Court has found M&M released Excalibur from its duty of confidentiality with regard to the seismic data on February 25, 2004, and because Excalibur did not begin discussions of the development of its property with Quest until May of 2005, whether or not Excalibur and Quest created a "sham consultancy in order to evade the confidentiality obligation" is immaterial. After February 25, 2004, Excalibur could use the seismic data in any manner it chose, provided it did not

32

violate the laws of the State of Louisiana.  Moreover, M&M had an exclusive option to enter into

a mineral lease with Excalibur over the Straight Line Prospect (or any other Excalibur property) for

an 18 month period.  It also had the right to extend its exclusive option over any or all of Excalibur's

property for an additional six months for the sum of $40.00 per acre.  Indeed, during the period of

its exclusive option, M&M availed itself of its option rights and entered into a lease of 409 acres

west of, and contiguous to, the Straight Line Prospect.  The fact that M&M, for whatever reason,

failed to exercise its option and lease the Straight Line Prospect prior to termination of its option,

cannot inure to the detriment of Quest or Texas Tea.[32]  Because the Court finds neither Quest nor

Texas Tea engaged in any behavior appropriately described as offensive to public policy, unethical,

oppressive, unscrupulous or substantially injurious, M&M's claim for unfair trade practices against

Texas Tea and Quest must fail.

## E.    Unjust Enrichment

Myane & Mertz has asserted a claim of unjust enrichment against Quest and Texas Tea.

Pursuant to Louisiana law, "[t]here is a general concept of quasi contractual obligations; it is a

concept based upon the principle that where there is an unjust enrichment of one at the expense or

impoverishment of another, then the value of that enrichment or else, in some cases, the amount of

the impoverishment, must be restituted." Minyard v. Curtis Products, Inc., 205 So.2d 422, 432

(1967) (citing Planiol, Traité Elémentaire De Droit Civil, T. 2. n. 812, n. 813 (8th ed.1939)).[33]  The

---

[32]The only explanation provided as to why M&M failed to lease the Straight Line Prospect when it had the exclusive option to do so is that M&M simply overlooked the potential of this acreage during the option period. See Deposition of Michael Puzio, M&M's geologist. [Doc. 145-6, pp. 26, et seq.]

[33]See also, Scott v. Wesley, 589 So.2d 26, 27 (La. 1st Cir.1991)("The root principle of an unjustified enrichment ... is that the plaintiff suffers an economic detriment for which he should not be responsible, while the defendant receives an economic benefit for which he has not paid.") (citing Tate, The Louisiana Action for Unjustified Enrichment: A Study in Judicial Process, 51 Tul.L.Rev. 446, 459 (1977)).

concept is codified at Louisiana Civil Code Article 2298, entitled "Enrichment Without Cause; Compensation," which provides in pertinent part:

> A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.

The requirements of a claim for unjust enrichment are the following: (1) there must be an enrichment, (2) there must be an impoverishment, (3) there must be a connection between the enrichment and resulting impoverishment, (4) there must be an absence of "justification" or "cause" for the enrichment and impoverishment, and (5) there must be no other remedy at law available to plaintiff. Baker v. Maclay Properties Co., 648 So.2d 888, 897 (La.1995).

In this matter, M&M cannot rely upon the doctrine of unjust enrichment. First, as to Quest, there was no "enrichment." Although Quest obtained a mineral lease from Excalibur, the lease ultimately provided no enrichment to Quest, as Quest never drilled a well on the leased property. [Doc. 138, p.11][34] Second, M&M cannot rely upon the equitable doctrine of unjust enrichment as to Excalibur, as other remedies at law are available to plaintiff - namely, misappropriation of trade secrets. As the Fifth Circuit held in Sheets v. Yamaha Motors Corp., U.S.A., 849 F.2d 179, 184 (5th Cir. 1988):

> Louisiana enacted an express statutory scheme to protect individuals and entities in the position of . . . [plaintiff] when it adopted the Uniform Trade Secrets Act. Under Louisiana law, . . . [plaintiff] is not entitled to fall back on the equitable doctrine of unjust enrichment after failing to establish a trade secret due to his failure to make reasonable efforts to maintain secrecy. Thus, in a very real sense the enrichment by Yamaha was brought about by . . . [plaintiff's] own failure to maintain the secrecy of his invention.

---

[34] According to Quest, the lease actually cost Quest a considerable amount of money, as it never drilled a well due to the instant litigation. [Doc. 138, p.11]

> Louisiana law makes clear that when an adequate remedy at law is available, the court may not resort to principles of equity. Austin v. North American Forest, 656 F.2d at 1089. See La.Civ.Code Ann. art. 21; Minyard, 205 So.2d at 433. An action for unjust enrichment must not be allowed to defeat the purpose of a rule of law directed to the matter at issue. Edmonston v. A-Second Mortgage Co. of Slidell, Inc., 289 So.2d 116, 122 (La.1974). In Austin v. North American Forest, we held that a court applying Louisiana law could not resort to equity even though the remedy at law was barred by prescription. [Plaintiff] ... had a remedy under the Trade Secrets Act by which he could have recovered for the alleged misappropriation of his modification to the Yamaha tri-motorcycle. He failed to gain the protection of this act by his carelessness. Under Louisiana law he cannot now invoke principles of equity to recover for the benefits he alleges appellees enjoyed at his expense.

Finally, M&M's brief is silent as to any claim of unjust enrichment against Texas Tea, and therefore M&M has failed to carry its burden of proof for that claim.[35]   Accordingly, plaintiff's claim for unjust enrichment must be denied.

## IV. Conclusion

For the reasons provided, the Court hereby GRANTS, in their entirety, the motions for summary judgment filed by Quest Exploration, LLC, Excalibur Land Co. Inc., and Texas Tea LLC. [Doc. Nos. 145, 152]  The parties are to submit a final judgment, approved as to form, no later than November 30, 2009.

In light of the foregoing, the "Joint Motion to Exclude or Limit Testimony of William H. Robbins on Behalf of Excalibur Land Company, Inc., Texas Tea, L.L.C., and Quest Exploration, L.L.C." [Doc. 164], the "Motion for Leave to File Joint Reply..." [Doc. 179], the "Motion to Exclude Evidence of Oil Production by Third Party" [Doc. 185], the "Motion in Limine" [Doc. 186], and the "Motion in Limine on Behalf of Mayne & Mertz, Inc." [Doc. 187] are DENIED AS MOOT. Additionally, Excalibur and Texas Tea's "Unopposed Motion for Leave to File Reply Brief" [Doc.

---

[35]Additionally, the Court notes Texas Tea was not formed until after Excalibur entered into the mineral lease with Quest.

165] and Quest's "Motion for Leave to File Reply..." [Doc. 170] are DENIED, as the Court finds

they are repetitive and therefore unhelpful to the issues at hand.  Because the Court has denied all

defendants' motions for leave to file reply briefs, M&M's Motions to Strike Additional Evidence

[Doc. Nos. 171, 172], and M&M's Motions to File Reply Briefs [Doc. Nos. 175, 176] are DENIED

AS MOOT.

THUS DONE AND SIGNED at Lafayette, Louisiana, this ___3___ day of November, 2009.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE